RIEMORE E. NUGENT COLLINS, Plaintiff-Appellee, *v.* BEVERLY NU-
GENT, Indiv. and as Ex'x of the Estate of Jack A. Nugent, Deceased, *et al.*,
Defendants-Appellants.

First District (1st Division) No. 81—2768

Opinion filed December 6, 1982.

Schumacher, Jones, Kelly, Olson & Pusch, of Chicago (H. Barringer Pusch, Richard A. Marsh, and Gerald P. Giese, of counsel), for appellants.

Mayer, Brown & Platt, of Chicago (Patrick W. O'Brien, George T. Bogert, and Barbara Bertok, of counsel), for appellee.

JUSTICE GOLDBERG delivered the opinion of the court:

The record brings before us an intrafamily struggle for ownership of a number of closely held corporate entities. This suit was brought by Riemore E. Nugent Collins (plaintiff), both individually and as beneficiary and trustee of various trusts, against a variety of defendants some of whom are also beneficiaries and trustees of trusts. In essence, however, plaintiff is suing the widow and heirs of her deceased half brother John A. Nugent. Plaintiff seeks rescission of a "realignment" of the family companies commenced in 1959 and a declaratory judgment regarding the ownership of the stock in the family companies. After hearing the case without a jury, the trial court entered judgment for plaintiff. Defendants appeal.

Plaintiff's father, William J. Nugent, was founder, president, and unchallenged director of the Nugent companies. These companies included Great Lakes Storage and Contracting Co., Maritime Services, Ltd., Midwest Machinery Movers, Inc., Mechanical Wallmaster, Inc., Nugent's-American Contractors, Inc., Nugent Services, Inc., and Superior Dock & Warehouse Co. It is not necessary to outline the various modifications in the structure of these companies.

William Nugent's wife was Myrtle Nugent. Plaintiff was the only

child of that marriage. Myrtle had a son, John, by a previous marriage. After Myrtle's marriage to William, John lived in their home and, although never formally adopted by William, assumed the name of John or Jack Nugent. John Nugent was 20 years older than plaintiff. They were very close, and plaintiff was the flower girl at John's wedding. John became quite active in the operation of the Nugent companies. He was considered William's chief aide in managing the business.

On August 16, 1951, a trust was established by William Nugent. Defendants' counsel refers to this trust as a "certain" trust. Plaintiff's counsel refer to the trust as the "1951 trust." The trial court found in the judgment that this trust was also known as the "Riemore Trust," the "Riemore Nugent Trust" and by other names. We will use the designation, "1951 trust." John Nugent was named trustee of this trust. Plaintiff was the sole beneficiary. John eventually resigned as trustee on December 30, 1958. Myrtle became successor trustee until February 24, 1959. Then, by simultaneous instruments, Myrtle resigned and plaintiff appointed herself trustee. Therefore, after February 24, 1959, plaintiff was both beneficiary and trustee of the 1951 trust.

The corpus of the 1951 trust included the stock of Mechanical Wallmaster, Midwest Machinery Movers, and Maritime Services. By the terms of the trust, plaintiff was to receive income therefrom until her 30th birthday. Then the trust was to terminate and plaintiff would become outright owner of the companies involved.

In 1954, plaintiff enrolled at Northwestern University. After her first semester there, she became engaged to her hairdresser, Carl Rosauer. She withdrew from college and they were married in 1955. William Nugent did not approve of the marriage. However, the birth of plaintiff's son, William Rosauer, in 1956, seems to have changed William Nugent's attitude toward both Carl and the marriage. In November 1956, William Nugent established the William Rosauer trust which granted income for life to plaintiff and Myrtle with the remainder to plaintiff's children in equal shares. The stock of Nugent Services and Nugent's-American Contractors was transferred into this trust. In 1957, Carl Rosauer began to work for the Nugent companies and he became secretary-treasurer.

William Nugent died suddenly on May 12, 1958. His last will created a testimentary residual trust. Under this trust Myrtle received income for life. Plaintiff received the income after the death of her mother. John Nugent was left without any interest in the companies and was granted only a $15,000 bequest.

At the time of William Nugent's death, the number of Nugent companies had been reduced by merger of Midwest Machinery Movers and Mechanical Wallmaster into Maritime Services. The stock of Maritime Services continued to be owned by the 1951 trust. The William Rosauer trust owned the stock in Nugent's-American and Nugent Services. Superior Dock & Warehouse was owned outright by William Nugent and became part of his estate. Myrtle Nugent became the owner of Great Lakes Storage.

Upon the death of William Nugent, John Nugent became president of the Nugent companies though he had no proprietary interest in them. John was dissatisfied with the situation. Soon after the death of William Nugent, John approached both plaintiff and Myrtle. He insisted he receive half of the Nugent companies. He warned that if they did not accede to his request he would leave the companies and either work for a competitor or start his own business. Plaintiff and Myrtle agreed to John's demand. Plaintiff testified she did so reluctantly.

Thereafter, in 1959, a complex series of transactions was executed. Though the specifics of the plan are most complicated, and sometimes vague, John Nugent and plaintiff established the John A. Nugent trust and the Riemore E. Nugent trust, respectively. Although a concise statement of the entire realignment is impossible, it appears that the trusts were initiated through a loan from the Myrtle C. Nugent trust. The trusts would borrow cash from Great Lakes Storage, with the John A. Nugent trust borrowing additional money from the Myrtle Nugent trust. These trusts used the cash to purchase shares of the Nugent companies from the various trusts which owned them. Thereafter, the trusts would pay back the loans through their share of the profits generated by the Nugent companies.

An accountant testified that the realignment agreement and the subsequent buy-sell agreements created a "closed" system whereby the Nugent companies would really not have to generate a profit to keep the system operating and to continue the transfer of the ownership of Nugent companies' stock. However, the accountant admitted his calculations did not include family accounts through which both John Nugent's and plaintiff's families would regularly draw money from the companies.

The system was conceived by Edmund Spencer, who had been William Nugent's personal attorney, accountant and friend. Spencer also did considerable legal and tax work for the Nugent companies. The parties stipulated he had drafted the 1951 trust and other relevant trust documents. Before the system went into effect, Spencer

discussed the plan with attorneys Fred Jonas, attorney for the William Nugent estate, and Fred Turner, attorney for John Nugent. Both Jonas and Turner died before this litigation commenced.

In the mid-1960s friction developed between the Nugent and Rosauer families. John tried to fire Carl. Carl hired an attorney, Frank Wright, who counseled Carl about his rights in the Nugent companies. The attempt to fire Carl was unsuccessful and there were discussions toward an amicable division of the family companies, but the discussions failed.

In 1974 plaintiff divorced her husband. He then left the Nugent companies. Plaintiff took a more active role in the operations of the business. She testified that she started coming to the companies' office in Chicago in an effort to learn the business. John Nugent died on January 11, 1979. Upon John's death plaintiff became president of the Nugent companies. When Myrtle was informed of the death of her son, she immediately changed her will and gave her entire estate to plaintiff. Myrtle Nugent died on February 14, 1979. This suit was filed on October 23, 1979.

Virtually all of the facts set forth above are accepted by both parties. However, the parties dispute additional facts and the interpretation thereof. Therefore, we must briefly outline some of the relevant testimony.

Plaintiff testified that during her "early years" she was handicapped by dyslexia, a learning difficulty which affected her reading ability. Plaintiff stated she had absolutely no knowledge of the terms or even of the existence of the 1951 trust, until the trust instrument was discovered inadvertently in 1979. She testified John never told her about it and never mentioned it to her. Plaintiff believed all the income she was receiving from the trust was actually from her father's estate.

"Right after" her father died, John told her she and their mother had received "everything" and he had received "nothing." John demanded half of the companies. He told her he would go into competition and "you won't have anything." About a week later, plaintiff discussed this demand with her mother, her husband, and Edmund Spencer. Her husband and Edmund Spencer advised her to accept John's demands. Spencer told her if she did not acquiesce John would go into business "and you will be sitting there with nothing." Plaintiff had no discussion with Spencer concerning "outside, non-company connected counsel" to advise her.

Plaintiff did not attend any meeting concerning the plan to reorganize the companies. Her husband went to these meetings. By letter

dated August 8, 1958, Mr. Spencer sent copies of the proposed plan to plaintiff's husband. She testified this letter and the document were never shown to her. Similarly she stated she never saw a letter from Mr. Spencer dated September 25, 1958, addressed to her husband or an analysis of the Nugent companies which was enclosed. Plaintiff testified she did not understand the plan. However, she realized the various documents she was signing in great number were to effectuate the realignment as demanded by John. From time to time, her husband would bring home various checks and documents for her to sign. She would simply sign at the indicated places without reading the documents and without understanding their significance. Even between 1960 and 1962 she signed many checks tendered to her by her husband. Some of the checks had her initials affixed so as to indicate where she was to sign or endorse them.

Plaintiff testified that during May or June of 1979, she was in the Kinzie Street office. Joanne Gorczyza had been employed by the Nugent companies since July 1948. She supervised accounting operations at the Kinzie Street office since 1952. Gorczyza testified the company safe had a combination lock. In one corner of the safe was a locked compartment with three drawers. One of these drawers was also locked. She has kept possession of all of these keys. During May or June of 1979, she received a building violation notice. At that time plaintiff was in the office. She brought plaintiff a number of documents from the safe pertaining to the violation. She also brought plaintiff the original document containing the 1951 trust. Plaintiff testified that was the first time she had ever seen this trust document or had knowledge of its existence.

Brian Lambert testified he is a certified public accountant who was assigned in late 1978 to audit the Nugent companies and examine "some questionable expenses" in the course of preparing a financial statement. Plaintiff specifically asked him to examine a series of checks she signed at a particular time every year and to determine "what they meant."

When the witness began his audit, he was presented with "literally a garbage bag" full of checks and bank statements. During his analysis, the witness noted reference to the 1951 trust and the Myrtle C. Nugent for Riemore E. Nugent trust. He questioned plaintiff regarding those trusts. Plaintiff advised she had no knowledge of them. Plaintiff also stated she did not know the significance of various checks she endorsed to effectuate the reorganization of the Nugent companies and the repayment of various loans.

After the 1951 trust was uncovered in 1979, Lambert was able to

determine that the 1951 trust and the Myrtle Nugent for Riemore Nugent trust were one and the same. Furthermore, only after perusing the 1951 trust instrument could the witness successfully determine how the Nugent companies were realigned and how the system, which effectuated the reorganization, operated. The witness stated he had never seen a system to repay loans as complex as this.

Jerome Hankin testified he was comptroller of the Nugent companies from 1962 through 1978. When he came to the companies they were on the verge of bankruptcy. Neither John nor plaintiff knew very much about the business. After 1966 the witness "basically ran the companies" himself "by default." The companies "really began to take off" in 1967. The witness believed he was the reason for the dramatic financial turnaround of the Nugent companies.

Hankin testified he was responsible for keeping the books for both the companies and the family trusts. He prepared the checks which effectuated the buy-sell agreements, and loan repayments. That job took no longer than a few hours a year. The witness also helped prepare the tax returns of the 1951 trust. Plaintiff signed those returns.

Hankin stated he had many discussions with plaintiff about the business. In 1962 or 1963 plaintiff "bemoaned" the fact that she and her mother were forced to sell half the companies to John. However, plaintiff felt she had to because "John was active in the business and she knew nothing abut it at that time." To his knowledge the first time plaintiff requested the trust and corporate records of the companies was during the early part of 1974. He testifed he frequently gave Rosauer checks to take home for plaintiff's signature during the years 1962 to 1974. The checks were marked to evidence the places for signature.

In this regard, plaintiff testified she knew Jerome Hankin before she became active in the Nugent business. She and her husband Rosauer saw Hankin and his wife socially. She never discussed the 1951 trust with Hankin. She did speak to him about the 1959 trusts.

Hankin testified he discussed with plaintiff the system to reorganize the companies. He explained to her how the trusts were interrelated and how the various loans were repaid. The 1951 trust was specifically discussed. The witness stated these discussions took place during the 1960s and plaintiff was aware she owned half of all the companies. Plaintiff testified neither she nor Hankin understood the reorganization. Hankin testified Mr. Spencer had received letters from the "government" to explain the absence of "estate tax" on the reorganization. However the government was "so confused" about the plan they allowed the limitation statute to run without action.

The witness held plaintiff partially responsible for a criminal investigation into his taxes. However, he also held John Nugent and his wife and son responsible for forcing him to leave the Nugent companies.

Carl Rosauer testified that in 1958 John Nugent and his attorney Fred Turner told him that John wanted half of the companies or he would start his own business and "eventually take all of the employees away." Rosauer stated he and Edmund Spencer discussed the matter and Spencer explained the specifics of the realignment to plaintiff and himself. Plaintiff agreed that the plan was the best way to deal with the situation. Plaintiff also discussed the plan with the attorney of her father's estate, Fred Jones, and plaintiff's confidant, Dr. Minnema. The witness stated the plaintiff wanted to be "fair" with John, and she believed that if she did not accede to his demands, her mother would leave everything she had to John anyway.

In 1966 he and plaintiff hired Frank Wright to counsel them regarding the prospective split of the companies. Plaintiff testified Rosauer himself hired Mr. Wright. She stated she met Mr. Wright only twice; once at her home and once later at Navy Pier. Rosauer testified that Wright wrote a long letter later described as defendants' Exhibit 38, at the request of plaintiff and himself. The witness did not remember how the letter came to their home, but Mr. Wright customarily hand delivered documents to their home. He himself went over to Frank Wright's home about a year before trial and got a copy of defendants' Exhibit 38. He remembers reading the letter and discussing it with plaintiff. In his deposition Rosauer manifested doubt as to whether this letter was mailed or hand delivered. He did not know which was correct. Rosauer testified he, plaintiff and Frank Wright discussed the 1951 trust. In his deposition Rosauer testified he did not discuss this trust with the plaintiff.

He would often bring documents and checks home from the office for plaintiff to sign. He testified plaintiff would always ask him "about what she was signing." Rosauer stated it took about a year to work out the entire plan.

In his divorce decree from plaintiff, he was awarded a cash settlement, which would come out of the Nugent companies. He and plaintiff had borrowed money from the William Rosauer trust. However, after litigation, the witness had to repay the loan himself. The witness was either in the process, or would soon be in the process, of suing plaintiff for not satisfying the judgment in the divorce decree. He testified that the William Rosauer trust obtained a judgment against him for about $74,000.

Frank J. Wright, a retired lawyer, testified he first met Carl Rosauer about June of 1966. He did not meet the plaintiff at that time. He was retained by Rosauer to represent Rosauer when John Nugent attempted to discharge him. However, he felt that he represented plaintiff as well as Rosauer. He spoke to Rosauer on almost every business day until the end of 1967. He first met plaintiff at her home, although he did not specify the date of the first meeting. He testified there was "complete antagonism" between Rosauer and plaintiff on the one hand and John Nugent on the other. From time to time Wright had contact with the Nugent companies. When he first met Rosauer, the shares of all of these companies had been evenly divided between plaintiff's trust (Riemore E. Nugent trust of February 1959) and John Nugent's trust (John A. Nugent trust).

Wright testified he prepared the 16-page copy of a letter referred to as defendants' Exhibit 38, dated as of December 8, 1967. He testified he prepared the original letter for clarifying the so-called oral family settlement agreement between plaintiff and John Nugent. The witness stated he prepared the letter after different informal discussions with plaintiff and Rosauer. However, the copy of the letter is addressed to the plaintiff only. He testified that he carried the original and two copies of the letter to the Rosauer home and delivered them to "Carl [Rosauer] or Riemore [plaintiff]." He had no recollection of either Rosauer or plaintiff requesting such a letter. However, as to which one of these persons the delivery was made, he testified, "They would both be there." He also said "Well, its made out to Riemore [plaintiff], so I presume I gave it to her."

Wright testified he had a file at his home containing various documents. In the fall of 1980, he gave this file to Rosauer. Apparently the file contained the copy of the letter identified as defendants' Exhibit 38. The photocopy of this document shows it was prepared on copy paper as evidenced by the word "COPY" in large vertical letters thereon.

Plaintiff testified she never received this letter. She did not discuss the letter or any letters from Mr. Wright, never was at his office and never retained him. Her husband retained Wright and she met him two times. The reason for both of these meetings was the discharge of Carl Rosauer by John Nugent. Plaintiff never paid Wright for any of his services. The trial court denied defendants' motion to admit the letter into evidence.

Edmund Spencer was close to 85 years old when he testified. He was both an attorney and a certified public accountant. He practiced law from 1943 until his retirement in 1969. He considered that he

represented "everyone" in the family when he effected the company realignment. He acted as corporate and tax advisor for the late William Nugent from 1945 until Nugent's death. He never personally rendered legal services or advice to plaintiff. However, he discussed the realignment plan with everybody in the family including plaintiff. Concerning plaintiff he testified, "I think I spoke to her a couple of times." In explaining the plan to plaintiff, the witness made specific reference to the 1951 trust. Plaintiff testified, "I trusted Mr. Spencer." Spencer frankly told the trial court, "I am ashamed to admit it but my memory is so bad."

Edmund Spencer also testified that he cooperated with two attorneys named Fred Turner and Fred Jonas in the matter of the realignment. At that time Jonas was the attorney for the estate of William Nugent. However, Spencer testified he supervised all corporate matters in accounting and prepared income tax returns for family members. With reference to the book value of the stock of all of the Nugent companies in 1959, Spencer stated he himself was not an appraiser and he did not obtain appraisals. He could not state the cash position of the various Nugent companies at the time of the death of William Nugent. On cross-examination on the issue as to whether plaintiff was present when the witness met with Fred Jonas, John Nugent, Carl Rosauer and Fredrick Turner, the witness answered, "For you to expect me to recall people present at every meeting is utterly impossible, even when I still had my brains."

Plaintiff testified briefly on rebuttal. She repeated that the attorney Frank Wright was present in her home once. This was during the summer of 1966. This visit was at the request of Rosauer when John Nugent was attempting to discharge him. The only other time she saw Frank Wright was at a meeting of the shareholders and directors of the Nugent companies.

After hearing oral argument, both sides filed proposed findings of fact and conclusions of law with the trial court. The trial court accepted the findings and conclusions submitted by plaintiff and final judgment was entered accordingly.

Although the briefs filed by both parties are inordinate in length and unduly complicated, in our opinion there are three decisive issues here which we will consider in order:

(1) Was there a fiduciary relationship between the late John Nugent and plaintiff?

(2) If so, was this relationship breached by the dominant party?

(3) Is plaintiff's suit barred by *laches*?

## I

 In view of the fact that John Nugent was trustee of the 1951 trust with plaintiff as sole beneficiary thereof, it follows necessarily that the relationship between them was fiduciary as a matter of law. As pointed out by the supreme court in *Home Federal Savings & Loan Association v. Zarkin* (1982), 89 Ill. 2d 232, 239, 432 N.E.2d 841, the relationship between trustee and beneficiary is such that "the former is charged with equitable duties toward the latter." The court describes those duties as resting upon the trustee "to serve the interests of the beneficiary with complete loyalty, excluding all self-interest," which "prohibits him from dealing with the trust property for his individual benefit." 89 Ill. 2d 232, 239.

When John Nugent resigned as trustee of the 1951 trust, the relationship undoubtedly continued to be fiduciary as was factually determined by the trial court. John was most active in the operation of the family business. Plaintiff on the other hand was inactive. Undoubtedly in his day-to-day operation of the business, John was in effect an agent or a partner of the plaintiff so that fiduciary duties were imposed upon him.

 Where the fiduciary relationship does not exist as a matter of law, clear and convincing evidence is required to establish such a confidential relationship. This burden then rested upon plaintiff to prove the existence of a fiduciary relationship. It has been stated many times that courts have refrained from stating the exact boundaries of this relationship. It has been repeatedly held in describing this type of fiduciary relation (*Kester v. Crilly* (1950), 405 Ill. 425, 432, 91 N.E.2d 419):

> "In general, in the law of constructive trusts, a confidential relationship exists in all cases when one person reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first. [Citations.] The relationship may exist as a matter of law, as between principal and agent, guardian and ward, attorney and client, and the like, or it may be moral, social, domestic, or even personal. *** Factors to be taken into consideration are degree of kinship, if any, disparity in age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly servient party entrusts the handling of his business and financial affairs to the other and reposes faith and confidence in him. The mere existence of a confidential relationship prohibits the dominant party from seeking any selfish benefit during the course of the relationship and affords a basis for fastening a

constructive trust upon property so acquired."

In the instant case, the evidence proves clearly and convincingly that the relationship between John and plaintiff was fiduciary even in the absence of a legal relationship between them such as trustee and beneficiary and principal and agent. John was a half brother of plaintiff, 20 years older than she. For years they lived in the same household as brother and sister. Plaintiff did not initiate her active role in the business so as to learn something about its operation until 1974 when she divorced her husband. See *Badger Building Corp. v. Gregoric* (1981), 102 Ill. App. 3d 594, 597-98, 430 N.E.2d 561, *appeal denied* (1982), 91 Ill. 2d 551, and cases there cited.

Plaintiff constantly entrusted the handling of her business and financial affairs to John Nugent. She constantly reposed faith and confidence in the manner in which he handled the business. He devoted his entire time to the business and she was busy with domestic affairs and with rearing her children. Plaintiff signed a great number of checks and documents without question because of the confidence she had in John. The fact that she agreed, although reluctantly, to permit John to become half owner of the companies is in itself another example of the confidence which she reposed in him.

■ The trial judge expressly found plaintiff had a great love for her half brother, "reposed great trust and confidence in him" and also "relied upon him to handle business affairs for her." The trial court heard all of the evidence in open court together with lengthy argument by able counsel. This situation should not be confused with one in which, under former practice, the evidence in the type of case before us would be heard by a master in chancery and the record reviewed by the court. In the case at bar, the general rule of long standing applies that because the trial judge has heard the testimony in open court and seen and heard the witnesses, a reviewing court "will not reverse his findings of fact unless they are palpably against the weight of the evidence." (*Kolze v. Fordtran* (1952), 412 Ill. 461, 468-69, 107 N.E.2d 686.) We conclude that the findings of the trial court are not contrary to the manifest weight of the evidence. (See *Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110, 382 N.E.2d 1205, quoting *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624.) Thus, in the case at bar we must accept that there was at all material times a fiduciary relationship between the plaintiff and the late John Nugent.

## II

■ Citation of authority is hardly necessary to support the legal

proposition that establishment of the existence of the fiduciary or confidential relationship places the burden of proof upon those who seek to support the attacked transaction. In *Curtis v. Fisher* (1950), 406 Ill. 102, 108, 92 N.E.2d 327, the supreme court held:

> "In a case where the relationship was quite similar we said that transactions of parties standing in a fiduciary relation are *prima facie* voidable on grounds of public policy; that they will be closely scrutinized by a court of equity and relief granted unless the parties claiming the benefit of the contracts show by clear and convincing proof that they have acted in good faith and have not betrayed the confidence reposed in them. [Citation.]"

One of the latest pronouncements by the supreme court in a similar situation involving an express trust is set forth in *Home Federal Savings & Loan Association v. Zarkin* (1982), 89 Ill. 2d 232, 245-46:

> "Fiduciaries are not prohibited from having such direct dealings with their beneficiaries, but such transactions are subject to special scrutiny by the courts, and the burden is on the fiduciary to show that the transaction was fair."

■ In addition, the court in *Curtis* went further and set out the following principles to be applied in this type of situation (*Curtis v. Fisher* (1950), 406 Ill. 102, 108-09):

> "In *Krieg v. Felgner*, 400 Ill. 113, quoting from the opinion in *Schueler v. Blomstrand*, 394 Ill. 600, it was stated, 'Important factors in determining whether a particular transaction is fair include a showing by the fiduciary (1) that he has made a free and frank disclosure of all the relevant information which he had; (2) that the consideration was adequate, and (3) that the principal had competent and independent advice before completing the transaction.' "

Similarly in *Perry v. Elmore* (1980), 87 Ill. App. 3d 996, 999, 410 N.E.2d 371, we find the same guidelines expressly approved.

Considering these guidelines in order, first is the issue of free and frank disclosure of all of the facts by the fiduciary. The evidence here greatly favors plaintiff. The facts regarding the realignment were never disclosed to plaintiff by any of the other parties.

This appears clearly and definitely from plaintiff's own testimony. These is also testimony to the contrary that plaintiff knew about the existence of the 1951 trusts. But in any event, it appears that plaintiff was never fully informed of the trust provisions or of the legal significance of the trust. This conclusion is strongly supported by the testimony of Brian Lambert, the certified accountant. Nor can it be said

that plaintiff's signing of numerous checks and other documents from time to time operated as a full and complete disclosure of all of the facts to plaintiff. Additionally, even accepting the testimony of Carl Rosauer, Frank J. Wright, Edmund Spencer and Jerome Hankin, their testimony neither individually nor collectively, established a full and fair disclosure of all of the facts to plaintiff. The material facts here were not apparent from examination of any one document.

As regards the adequacy of consideration, the evidence favoring plaintiff is even stronger. It seems to us that the entire operation of the realignment plan is one of the most complicated and difficult systems ever devised by the fertile mind of man. We have done our best to study this situation and attempt to understand it. In oral argument, opposing counsel did their best to explain this system to this court. The conclusion we have reached is that this plan represents simply a most complicated system of shifting funds from one entity to another. The net result of the system was that John Nugent began with no proprietary interest of any kind in the various trusts and corporations here involved, but, at the time of his death in January of 1979, he was an equal partner with plaintiff in the entire Nugent family business. This was apparently accomplished without the payment from John to the plaintiff of any money or other thing of value. In effect plaintiff gave John an equal one-half interest in the entire family business as a gift.

Finally, the record shows beyond doubt that plaintiff never had any competent and independent advice before she completed this transaction. In this regard, Edmund Spencer testified simply that he thought he spoke to plaintiff about the transaction "a couple of times." In fact, it may be said that it was his duty to take affirmative steps to make certain plaintiff had competent and independent advice. Instead, Spencer took the position that he represented "everyone" in the family. It was manifestly impossible for him to properly "serve two masters," John Nugent and the plaintiff, in a situation of this kind. We need add simply that his advanced age made it patently impossible for him to give testimony of substantial value.

Considering other evidence, plaintiff's testimony seems clear and to the point. In fact, the only witnesses whose testimony stands unimpeached are plaintiff and the accountant Brian Lambert. The remaining witnesses tendered by defendants are all properly subject to adverse criticism.

Jerome Hankin, comptroller of the Nugent companies, was much impressed with his own ability and the fact that he himself actually, according to his version, was responsible for the success of the Nu-

gent companies. However, his bias against plaintiff is strongly evidenced. He considered plaintiff responsible for a criminal investigation into payment of his taxes.

The above statement of facts shows that Carl Rosauer was far from being a credible witness. For some undisclosed reason after suit was filed he visited the home of his former attorney Frank Wright and obtained the lawyer's entire file regarding the Nugent family business, including a copy of the lengthy letter allegedly addressed to plaintiff by Wright. Also his testimony was clouded by the fact that he had borrowed money from his son's trust, the William Rosauer trust which had obtained a judgment against him for $74,000. He admitted that he was about to sue plaintiff because of the fact that he was obliged to repay the loan himself.

Frank J. Wright, now retired, testified that he acted as attorney for Rosauer. He stated he wrote the letter dated December 8, 1967, and addressed to plaintiff (defendant's Exhibit 38), after discussions with both plaintiff and Rosauer. Although he admitted Rosauer was his client, he addressed the letter to the plaintiff only. His memory as to whom he delivered the letter was virtually nonexistent. He said, "I can't remember." He finally took refuge in the statement that since the letter was addressed to plaintiff he "presumes" he gave it to her. Against this there is clear and positive denial by plaintiff. She testified on rebuttal that she met Wright twice only, once at her home and once at Navy Pier. The reason for these meetings was the attempted discharge of Rosauer by John Nugent.

In this regard, defendants contend the trial court should have received the 16-page, single-spaced copy of the letter dated December 8, 1967, addressed to plaintiff. Plaintiff denied she had ever previously seen this letter. The trial court sustained an objection to the letter. The trial court sustained an objection to the letter. The letter purports to be as stated therein, "a rough outline of the family history. It is in no sense a definitive accountant's treatment of the financial aspects involved." Also, defendants' Exhibit 38 purports only to be a copy. There is no evidence as to whether it is in fact a true and correct copy of the original. Also, as shown, there is a strong denial by plaintiff that she ever received this letter. In any event, even assuming that the letter had been received in evidence, we do not find that it has sufficient probative value to satisfy the requirements above discussed in determining that the transaction here was fair and in good faith. This letter has no materiality regarding a violation of the fiduciary relationship. Under no circumstances can it be considered as independent advice concerning a transaction completed some years prior.

At best, the ruling of the trial court in this regard can be classified as harmless error.

We will add that the record and the briefs here show a strained relationship between the trial judge and able counsel for defendants. The trial record could have been improved by elimination of a number of superfluous statements. Although defendants complain about rulings and remarks by the trial court, it is the duty of this court to pass upon the legal propriety of the judgment entered by the trial court. We are not concerned with the various statements made by either the court or by counsel. The only issue before us is the legal propriety of the judgment appealed from; not the alleged motivation for that judgment. See *City of Kankakee v. Small* (1925), 317 Ill. 55, 64, 147 N.E.404; *Waldron v. Waldron* (1973), 13 Ill. App. 3d 964, 968, 301 N.E.2d 167.

■ In sum, we have reached the firm conclusion that the judgment appealed from is not contrary to the manifest weight of the evidence. Defendants have failed to sustain their position by clear and convincing evidence or even by a preponderance of the evidence.

### III

■ It is necessary to consider the issue of *laches* "in the light of the circumstances of each case." (*Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 553, 147 N.E.2d 341.) It has also been stated that the existence of *laches* "depends on whether, under all circumstances of a particular case, a plaintiff is chargeable with want of due diligence in failing to institute proceedings before he did." (12 Ill. 2d 547, 552.) However, a distinction must be made between the case at bar and cases such as *Pyle* and *Slatin's Properties, Inc. v. Hassler* (1972), 53 Ill. 2d 325, 291 N.E.2d 641. In *Pyle*, one of the parties paid taxes and leased a certain property for oil and gas for a period of 20 consecutive years. The court pointed out that a mineral estate was involved "the character of which necessitated a greater degree of diligence and promptness than would be otherwise required." (12 Ill. 2d 547, 555.) Similarly, in *Slatin's Properties, Inc.*, defendants paid taxes on the real estate involved for approximately 40 years during which time plaintiff took no action . 53 Ill. 2d 325, 331.

■ We conclude the situation is far different "in those instances when the existence of a fiduciary relationship is clearly established." (*Crowell v. Bilandic* (1980), 81 Ill. 2d 422, 428, 411 N.E.2d 16.) Similarly, in *Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555, 562, 402 N.E.2d 181, the court pointed out that a "person occupying the relation of fiduciary or of confidence is under a duty to reveal the

facts to the plaintiff (the other party)." We note that *Chicago Park District* and *Crowell* involved an issue not of *laches* but as to whether defendants were guilty of fraudulent concealment sufficient to toll a statute of limitations. However, in *Prueter v. Bork* (1981), 105 Ill. App. 3d 1003, 1007, 435 N.E.2d 109, on the issue of *laches*, this court held:

> "Defendants finally contend that plaintiff's action is barred by *laches*. Although the period of time on which *laches* is predicated normally begins to run either when the plaintiff learns of the facts on which his rights are based or when a reasonable person would acquire such knowledge [citation], a different rule applies where a fiduciary relationship is involved. Where a fiduciary has a duty to disclose certain facts to the plaintiff but fraudulently fails to do so, plaintiff's failure to use diligence to ascertain these facts is excused. In such cases, the running of time begins when the fraud is actually discovered by plaintiff. [Citations.]"

In the case before us, plaintiff urges there was a fraudulent concealment by John Nugent. The trial court found that this fraudulent concealment by a fiduciary defeats the defense of *laches*. Defendants take the position that there was an unreasonable delay by plaintiff in enforcing her rights combined with prejudice to defendants resulting from this delay. Defendants' argument is predicated primarily upon the fact that John Nugent, Myrtle Nugent, Fred Jonas, and Fred Turner were all deceased. Defendants urge certain events took place which show harm because of delay. These events are: receipt by plaintiff of distribution checks, the signing of such checks by plaintiff, the execution of income tax returns by plaintiff, and also the delivery of the Frank Wright letter to plaintiff. The last of these items is March 1974 when plaintiff first became an operating officer of the Nugent companies.

Under the view we take of this record, it is not necessary for us to consider the doctrine of fraudulent concealment. It seems to us that the crux of the matter here is a determination of whether delay by plaintiff was so harmful to defendants that the equitable doctrine of *laches* should be invoked. In our opinion, the situation goes deeper than the issue of discovery of the 1951 trust. In essence, plaintiff divested herself of a one-half interest in valuable property without receiving adequate consideration. There is no evidence that a full disclosure of all of the facts was ever made to plaintiff by any of the parties. It does not appear that Edmund Spencer ever disclosed these facts to plaintiff or that any person at any time did so.

Nor would the testimony of any or all of the deceased persons have alleviated this situation. This so-called realignment was extremely complicated and difficult to understand. In fact, it appears from the testimony of Brian Lambert, the certified public accountant, that plaintiff knew nothing about the actual operation of the plan, the reasons for the checks she signed and the fact that she received no consideration for a one-half interest in the Nugent enterprises. These facts were not brought to light until plaintiff had a copy of the 1951 trust and the certified accountant completed his examination of the entire matter sometime during 1979. And, in fact, plaintiff filed her suit against the defendants in October of that same year. The crucial point here is the question of a gross inadequacy of consideration moving to plaintiff.

In addition, plaintiff never had any competent and independent advice regarding this transaction. In this regard, the testimony of John and Myrtle Nugent would have had no effect. The point is made clear by Edmund Spencer that he did not ever suggest to plaintiff that she have independent counsel and plaintiff never did.

In this situation, the burden of proof of *laches* rests upon defendants. The trial court found in favor of plaintiff in this regard. We cannot say that his finding is contrary to the manifest weight of the evidence and it is accordingly affirmed.

For these reasons the judgment appealed from is affirmed.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.