151 Ill. App.3d 234 (1986)
502 N.E.2d 1146
In re ESTATE OF E. DAVIS WERNICK, Deceased (Garson Wernick, Ex'r, et al., Petitioners-Appellants and Cross-Appellees,
v.
Mitchell Macks, Respondent-Appellee and Cross-Appellant).
No. 85-1553.
Illinois Appellate Court  First District (1st Division).
Opinion filed December 29, 1986.
*235 *236 Theodore M. Becker, of Becker & Tenenbaum, of Chicago, for appellant Samuel S. Wernick.
Barry A. Feinberg, of Chuhak, Kienlen & Feinberg, of Chicago, for appellant Garson Wernick.
*237 Fred F. Herzog, of Layfer, Cohen, Handelsman & Mora, Ltd., of Chicago, for appellee.
Affirmed in part, and reversed in part and remanded.
JUSTICE O'CONNOR delivered the opinion of the court:
Petitioners-appellants and cross-appellees, Garson Wernick, executor of the estate of E. Davis Wernick, deceased, and Samuel S. Wernick, son of the decedent and beneficiary under his will (petitioners), brought proceedings in probate court in 1979 against respondent-appellee and cross-appellant, Mitchell Macks (Macks), to recover from Macks either the decedent's interest in two parcels of real property jointly held in a land trust with Macks or fair and adequate consideration for the decedent's interest in those properties. After protracted litigation, including a previous appeal to this court (In re Estate of Wernick (1983), 117 Ill. App.3d 855, 454 N.E.2d 20), the probate court found that in 1977, more than seven years prior to trial, Macks had breached a fiduciary duty which he owed to the decedent, necessitating the instant proceedings by petitioners to recover the decedent's interest in the subject properties, and that Macks had vexatiously delayed the litigation and petitioners' recovery of those interests. The court awarded petitioners one-half of the proceeds realized by Macks in 1978 through his sale of one of the properties plus statutory interest at the rate of 5%, and one-half of the beneficial interest in the other property still held in trust. The court failed to award petitioners any amount to compensate for the unjust enrichment and profit that had accrued to Macks over the lengthy period during which he had wrongfully exercised the sole and exclusive use of the properties and sale proceeds. The court also denied the petitioners' request for interest, litigation expenses and attorney fees, punitive damages, and sanctions under section 2-611 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2-611). We affirm in part, reverse in part, and remand for further proceedings.
The nature of the issues now before this court requires close scrutiny of the drawn-out sequence of events leading up to this appeal. During his lifetime, E. Davis Wernick was a physician engaged in the general practice of medicine. At the time of trial, Macks was a licensed attorney primarily engaged in real estate investment and was chairman of the board of Jefferson State Bank. He did not maintain a law office, although he did handle the legal matters relating to his real estate transactions.
Macks and the doctor were cousins and close personal friends, who socialized with their wives and owned property as neighbors in Michiana Shores. Macks testified that he and the doctor were "like *238 brothers."
Beginning in 1962, the parties invested equally in six properties. There was no written agreement as to the relationship, but the parties filed partnership returns for the properties. The doctor handled all day-to-day management of the properties, including the collection of rents, payment of expenses, keeping of records, and the maintenance of a separate checking account, while Macks handled all of the legal work relating to the real estate, including the preparation of contracts, closing statements, leases, and eviction notices and represented the parties in lawsuits relating to eviction and building violations. Macks also found suitable properties for purchase, screened all new tenants, and signed the doctor's name on various documents, including leases and contracts, when required.
In addition, Macks represented the doctor in the purchase of his primary residence, prepared wills for the doctor and his wife, and was the attorney for the doctor's wife's estate.
Late in 1976, the doctor was diagnosed as suffering from lung and brain cancer. Approximately six months prior to the doctor's death, Macks met with the doctor, the doctor's son, Garson, and his accountant to discuss the disposition of certain properties which Macks and the doctor held jointly. At that time it was agreed that the doctor's interests in certain properties would be purchased by Macks for the sum of $46,502.70. Another meeting was subsequently held, during which Macks alleged to have offered either to buy the doctor's one-half interest in a parcel of property commonly known as 60 East Cedar Street in Chicago (the Cedar property) or, alternatively, to sell his interest to the doctor. No agreement was reached at this meeting, however, and the doctor's son, Garson, testified before the trial court that in June 1977, his father told him that he would not sell the Cedar property because he knew it would increase significantly in value, and he intended to leave it to his sons.
There is no question but that both Macks and the doctor knew of the increased value of the Cedar property. The property was offered for sale in 1971-72 at prices ranging from $350,000 to $500,000 and was appraised at $325,000 in 1974 for the doctor's wife's estate. The doctor died on July 17, 1977. Two months later, the property was appraised at $405,000. Shortly thereafter, Macks put the property up for sale, and in July 1978, unbeknownst to the estate, Macks sold the property for $400,000.
Still proceeding under the assumption that the Cedar property and an additional property, commonly known as 1615 South Wabash Avenue (the Wabash property), were assets of the estate, counsel for *239 the executor wrote a letter to Macks in April 1979, requesting an accounting for the income, expenses, and profits on the Cedar property. Macks responded in a letter dated May 3, 1979, advising the estate that he had purchased all of the doctor's right, title, and interest in the Cedar property many months prior to his death and that the estate therefore had no remaining interest. A citation proceeding was then filed on behalf of the estate which Macks answered in an official pleading in March 1980. In his answer, Macks again denied having possession of any property belonging to the estate.
The executor then filed a request for production, seeking all documents supporting Macks' claim to full ownership of the Cedar property. Macks filed his initial response to the request in May 1980, claiming for the first time that he had given the doctor a $90,000 promissory note in exchange for the doctor's interest in the Cedar property. Macks had no copy of said note in his possession, however, and has at no time during the pendency of these proceedings produced evidence of any such note. Attached to Macks' response was a copy of an assignment of beneficial interest dated November 1976 by which Macks alleged that the decedent had transferred all of his interest in the Cedar property to Macks and Macks' wife. Macks further stated in the response that the alleged transaction was witnessed by Patrice Lane, the doctor's office nurse. Less than two weeks later, Macks filed an amended response to the executor's request for production, attaching a different assignment by which the doctor purportedly transferred all of his interest in the Cedar property to Macks. The new assignment was dated July 7, 1977, only 10 days before the doctor's death. In his amended response, Macks abandoned his former contention that Patrice Lane had witnessed the transaction and instead claimed to have been alone with the decedent at the time of the assignment. Macks subsequently produced another copy of the purported assignment bearing a different signature.
On June 9, 1980, Macks testified before the trial court with regard to the discovery proceedings. Macks stated that he and the decedent had purchased the Cedar property for $180,000 some seven or eight years previously, each party contributing one-half of the purchase price. Macks further stated that the decedent had executed the assignment on July 7, 1977, at which time Macks knew that the decedent was ill and undergoing treatment for cancer. He also claimed to be unsure as to whether anyone else had witnessed the purported transaction. Macks admitted having paid no money in exchange for the transfer.
At the conclusion of the hearing, petitioners were given leave to *240 file a citation to recover property in which they alleged that the subject real estate had been conveyed to Macks for less than adequate consideration only days before the doctor's death, that the doctor had not been represented by an attorney, and that the conveyance was not at arm's length and constituted a breach of fiduciary duty by Macks. Petitioners also alleged that Macks had never paid for the property and that title to the property was an asset of the estate. Macks denied each of these allegations in his answer to the citation.
Petitioners then filed an amended citation to recover, again alleging that a one-half interest in the land trust holding title to the Cedar property, or its monetary equivalent, was an asset of the estate which Macks had refused to transfer. Macks answered the amended citation in April 1982, denying a duty on his part to transfer any interest to the estate. In denying his failure to tender compensation for the interest, Macks alleged that he had given the doctor a $90,000 promissory note in exchange for the doctor's assignment of beneficial interest in a certain land trust which held title to the Wabash, as well as the Cedar, property. This representation was in direct conflict with Macks' subsequent deposition testimony wherein he represented that only the Cedar property was held in the subject land trust.
Petitioners then filed a motion for partial summary judgment which was the subject of a previous appeal to this court. Basically, without conceding the existence of any note, petitioners sought to recover $90,000 from Macks based solely upon Macks' admissions that the doctor's interest in the Cedar property had undisputed value of at least that amount. The trial court granted petitioners' motion and subsequently granted a motion by Macks converting the partial summary judgment to a total summary judgment which fully and finally adjudicated the rights and liabilities of the parties with respect to the subject property. On August 31, 1983, this court reversed the total summary judgment, affirmed the trial court's previous order for partial summary judgment, and remanded the cause for trial on petitioners' amended citation to recover. In re Estate of Wernick (1983), 117 Ill. App.3d 855.
Trial commenced on December 10, 1984. Petitioners called five witnesses, including the doctor's live-in housekeeper, his office nurse, and his son, Garson, none of whom could positively identify the doctor's signature on the purported assignment of beneficial interest. In addition, while Macks himself testified that the purported assignment took place in either the doctor's home or office on July 7, 1977, neither the housekeeper nor the office nurse could recall having seen Macks at either of those places during the two weeks prior to the doctor's *241 death. Neither of the doctor's sons had been informed of the alleged transfer, even though the doctor had previously stated that he intended to pass the property on to them.
Macks was the only witness to testify on his own behalf. He again stated that the purported assignment covered both the Cedar and Wabash properties, contradicting his previous court testimony that the doctor had assigned his interest in the Wabash property to Macks in 1976 and his deposition testimony that the alleged assignment and alleged promissory note pertained only to the Cedar property. Macks also testified that while he told the doctor that the assignment related only to the Cedar property, the Wabash property, which was held in the same trust, was of little value, and since the doctor had been interested in clearing out all of his properties, Macks "assumed" that the doctor had intended to include that interest in the transaction as well.
Finally, while Macks stated that he had exchanged the Cedar property for both real estate and cash, both the real estate broker involved in the sale and the purchaser testified that Macks received $400,000 in cash only for the property. Macks also testified that no copy of the alleged promissory note had ever been located, even though he customarily made copies of all documents.
After hearing the evidence, the trial court concluded that Macks was the attorney for and partner of Dr. Wernick, and, therefore, as a matter of law, that a fiduciary relationship existed between them; that the alleged transfer of the assignment of beneficial interest in the subject property was prima facie voidable; and that Macks therefore had the burden of showing by clear and convincing evidence both that the alleged transaction was fair and that he had acted in good faith. The court found that the evidence presented by Macks fell far short of the quantum of proof required to meet that burden.
In reaching its determination, the trial court noted that at the time the parties reached agreement as to the disposition of four of the six properties owned by them, meetings had been held with an independent counsel and attorney to advise the doctor, and that the execution of each of the prior assignments of beneficial interest had been witnessed by Patrice Lane. In contrast, the doctor had no independent counsel, and no one other than Macks was present at the time of the transfer of the subject property which allegedly took place only 10 days before the doctor's death. Nonetheless, Macks testified that this was not unusual because of the parties' close personal relationship. Further, Macks could not remember whether the transaction had taken place in the doctor's home or office, was unable to produce a *242 copy of the note, and claimed that he did not have sufficient funds to pay for the transfer at a time when the evidence showed that his checking account for the month of July 1977 had an opening balance of $85,338.67 and a closing balance of $107,165.83. The court also considered the fact that the note which Macks had allegedly given in exchange for the transfer was not paid until after protracted litigation instituted by the doctor's estate. While not mentioned by the trial court in its decision, this was also in direct contrast to earlier transactions, wherein the doctor had retained the assignments of beneficial interest for many months until receiving payment from Macks.
The trial court further noted testimony of the doctor's housekeeper that she could not recall seeing Macks at the doctor's house prior to the doctor's death and that the doctor was at the Mayo Clinic one week before he died and the testimony of his nurse that the doctor was either at the Mayo Clinic or at Michiana Shores during the last few weeks of his life.
Finally, the court considered the fact that the doctor, as executor of his wife's estate, was aware of the September 1974 appraisal value of the subject property at $325,000 and the additional fact that Macks had declined an offer of $350,000 for the same property in 1978.
After stating its belief that the proper measure of damages under the circumstances was to be determined by the amount by which the fiduciary was unjustly enriched and profited as a result of his breach of the obligation owed to the protected party, the trial court entered judgment on January 14, 1985, against Macks in the amount of $174,870.43. In so doing, the court subtracted the $90,000 which was eventually paid by Macks in July 1984 in satisfaction of the partial summary judgment entered against him in June 1982 from an amount calculated upon: one-half of the $377,250.24 realized by Macks as a result of the sale of the Cedar property plus interest at the statutory rate of 5% for vexatious delay, to be computed from July 7, 1977, the date of the alleged transfer, until entry of the partial summary judgment; interest to be computed at 5% on the sum of $98,625.12 from the time of entry of partial summary judgment until January 14, 1985 (the date of judgment in the citation proceedings), and interest to be computed on $90,000 at the judgment rate of 9% from the date of entry until paid. Macks was further ordered to transfer to the estate a one-half interest in the Wabash property. The court denied petitioners' requests for further compensation, interest, punitive damages, litigation expenses, and attorney fees, however, based upon its belief that Macks had not attempted to bring fraud upon the court and that no "aggravating circumstances" were present.
*243 Petitioners argue that while the trial court recognized the proper measure of damages under the circumstances, it failed to apply that formula to adequately compensate the estate where Macks had maintained exclusive control over the property with the ability to invest proceeds and derive the income and benefit therefrom for eight years.
On cross-appeal, Macks argues that the trial court erroneously characterized the parties' relationship as one of attorney-client, which resulted in holding him to an unfair standard of fiduciary, when in fact the transaction in question involved nothing more than a "buy-out" between two business associates in which each of them had an equal opportunity to purchase the others' interest in the subject property. The crux of Macks' argument is that while he "occasionally" performed legal work incidental to the parties' joint ownership of the properties, these services were provided without charge and were attendant to his co-ownership of the properties. Thus, in the same way that the management services were provided by the doctor, the work performed by Macks was for each investor's mutual interest and benefit in the properties. Macks denies having benefited in any way from any "superior knowledge" or position with respect to the investment properties and even goes so far as to suggest that it was the doctor, and not Macks, who was in the superior position. Finally, referring to his earlier offer either to buy out the doctor or to sell his own share of the property for $75,000, Macks claims that the estate should not now be allowed to benefit from Macks' "financial risk-taking" merely because the value of the property turned out to be significantly greater than the $90,000 price which he and the doctor had purportedly agreed to. Macks also claims that the trial court's award of prejudgment interest for vexatious delay was improper where there existed a "good faith dispute" over the status of the property, or, if proper, that the interest was at the correct rate because the trial court failed to find any "aggravating circumstances."
 1 In first addressing Macks' argument that a traditional "attorney-client" relationship did not exist with respect to the subject transaction, we cannot help but note the inherent inconsistencies between Macks' own pleadings and testimony in this regard. While in his answer to the estate's citation to recover property Macks unequivocally denied the allegation that the doctor was not represented by an attorney, at no time during the proceedings did Macks attempt to present any independent testimonial evidence with respect to the purported transaction, and, at the same time, Macks claims to have been the only person with the doctor at the time of the alleged transfer. Further, in addition to his routine preparation of all contracts, closing *244 statements, and other documents incidental to the parties' jointly-owned property, Macks admittedly prepared the documents of transfer related to the transaction at hand. We find these facts, when coupled with the circumstances surrounding the alleged transaction, to belie Macks' argument that a fiduciary relationship did not exist.
 2 There is no question but that when parties engage in certain relationships such as attorney and client, principal and agent, trustee and beneficiary, or partners, a fiduciary or confidential relationship may arise as a matter of law. It is also clear that, even in the absence of such traditional categorizations, the relationship will be found to exist as a matter of fact when one party reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first. (See McFail v. Brader (1960), 19 Ill.2d 108, 116-17,166 N.E.2d 46; Collins v. Nugent (1982), 110 Ill. App.3d 1026, 443 N.E.2d 277, appeal denied (1983), 93 Ill.2d 541.) In determining whether a fiduciary relationship has arisen, factors to be considered are degree of kinship, if any, disparity in age, health, mental condition, education, and business experience between the parties, and the extent to which the allegedly subservient party entrusts the handling of his business and financial affairs to the other and reposes faith and confidence in him. The mere existence of a confidential relationship prohibits the dominant party from seeking any selfish benefit. Collins v. Nugent (1982), 110 Ill. App.3d 1026, 1036, 443 N.E.2d 277.
 3 Macks does not dispute the fact that he and the doctor were partners, as well as cousins and "best friends" who had known each other for 50 years, or that when it came to the parties' business dealings, the doctor trusted him "implicitly." We therefore agree with the trial court's finding that there was at all material times a fiduciary relationship between the parties and that Macks, as the dominant party in this transaction, failed in his burden of proving by clear and convincing evidence that the subject transaction was fair. In reaching a determination as to fairness, important factors include a showing by the fiduciary that he has made a free and frank disclosure of all relevant information which he had, that the consideration was adequate, and that the principal had competent and independent advice before completing the transaction. Collins v. Nugent (1982), 110 Ill. App.3d 1026, 1038, 443 N.E.2d 277; citing Curtis v. Fisher (1950), 406 Ill.2d 102.
With respect to the adequacy of consideration, the trial court took into account each parties' initial $90,000 investment in the subject property, as well as evidence of the appraisals for $325,000 in 1974 and $405,000 only two months after the doctor's death. In addition, *245 the court heard testimony from Macks himself which, at the very least, casts serious doubt on Macks' argument before this court that he alone was willing to assume a "financial risk" at the time of the purported "buy out," including Macks' admission that he listed the same property for sale in 1971-72 at the prices ranging from $350,000 to $500,000. Finally, the court heard testimony from the listing broker that when Macks again offered the property for sale in 1977, he stated that he would not accept anything under $400,000.
Having so found, we now turn to petitioners' contention that the trial court failed to adequately compensate the estate for Macks' breach.
 4, 5 Petitioners argue that in addition to the statutory interest for vexatious delay, the trial court should have awarded interest at the prime rate in order to adequately compensate the estate for Macks' breach of fiduciary duty. Initially, we note that the trial court's finding of unreasonable and vexatious delay is a factual determination which will not be disturbed on review unless it is contrary to the manifest weight of the evidence. (Charles Selon & Associates, Inc. v. Estate of Aisenberg (1981), 103 Ill. App.3d 797, 801, 431 N.E.2d 1214; Hamilton v. American Gage & Machine Corp. (1976), 35 Ill. App.3d 845, 342 N.E.2d 758.) We agree with petitioners, however, that the award of merely statutory interest in the instant case falls far short of compensating the estate for the amount by which Macks was unjustly enriched and profited as a result of his breach of the obligation owed to the doctor over seven years prior to trial.
 6, 7 It is well settled that prejudgment interest is a form of compensation and that the decision whether to award such interest requires a balancing of the equities between the parties under the circumstances. (Michaels v. Michaels (7th Cir.1985), 767 F.2d 1185, 1204, cert. denied (1986), 474 U.S. 1057, 88 L.Ed.2d 774, 106 S.Ct. 797; Myron v. Chicoine (7th Cir.1982), 678 F.2d 727.) In situations such as the instant one involving a breach of fiduciary duty, the law does not permit defendants to obtain the beneficial use of plaintiff's funds at no cost to the wrongdoer, and, in determining the appropriate damages in such cases, courts have focused on making the plaintiff whole by placing him in a posture which assumes that he had the opportunity to utilize his funds in a reasonable manner. Cant v. A.G. Becker & Co. (N.D. Ill. 1974), 384 F. Supp. 814, 816; see also Jefferson National Bank v. Central National Bank (7th Cir.1983), 700 F.2d 1143 (holding that award on the basis of prime rate properly compensated estate for lost trust income opportunity caused by trustees' breach of fiduciary duty; that such award prevented trustee from *246 profiting from his breach of trust and was not, therefore, an improper award of prejudgment interest).
We therefore remand this cause with directions to award petitioners prejudgment interest at the prime rate in addition to statutory interest for vexatious delay, in order to adequately compensate the estate for the amount by which Macks was unjustly enriched.
 8 Next we reject Macks' claim that the trial court incorrectly calculated prejudgment interest to run from July 7, 1977, the date of the alleged transfer, because Macks did not "realize a gain" from the sale of the property until September 15, 1978, and it was not until that date that the damages in this cause became ascertainable. Interest is clearly an element of recoverable damages that is within the trial court's discretion to allow where such damages are either liquidated or where they can be ascertained by simple and certain computation. (Emmenegger Construction Co. v. King (1982), 103 Ill. App.3d 423, 429, 431 N.E.2d 738.) We believe that the appraisal for $405,000 on the subject property as of July 17, 1977, only 10 days after the alleged transfer, was sufficient evidence of the property's value at the time of transfer upon which the trial court could compute interest.
Macks also claims that the trial court incorrectly granted post-judgment interest on the $90,000 partial summary judgment amount from the date of entry until payment because Macks unconditionally tendered the full amount in open court on June 28, 1982, at which time petitioners refused to accept it. Our review of the record, however, reveals that Macks has mischaracterized important facts.
In its June 4, 1982, order the trial court granted petitioner's motion for partial summary judgment. On June 9, Macks presented a motion for modification of judgment, seeking to convert the June 4 order to a grant of "total summary judgment which fully and finally adjudicates the rights and liabilities of the parties with respect to the property which is the subject matter of the Amended Citation to Recover Property." Based upon its misconception that petitioners had elected their remedy of enforcing the transaction between the parties and had thereby abandoned their theory of relief that no transaction had occurred, the trial court granted Macks' motion for modification on June 23, and subsequently declined to rule on the petitioners' motion to vacate and reconsider its order prior to the time for filing a notice of appeal to this court. Petitioners then filed their notice, and it was in this posture that Macks sought to tender payment of the summary judgment amount, but only in exchange for an indemnification and in full satisfaction of all amounts due and owing under the trial court's order as modified.
*247  9 Due to their legitimate concern that acceptance under the terms as specified would preclude their pending appeal, petitioners refused payment at that time and filed a motion with this court to enforce the $90,000 money judgment without prejudice. Macks responded, again seeking to tender the judgment amount in full payment and satisfaction of the trial court's order as modified and, upon furnishing evidence of payment, to have petitioner's appeal dismissed with prejudice on the ground of mootness. Thus, in view of the fact that each of Macks' "unconditional" tenders of payment were expressly conditioned upon the dismissal of the estate's remaining actions against him, we find that the trial court correctly granted post-judgment interest from the date of judgment on June 4, 1982, until July 11, 1984, the eventual date of payment.
 10 Petitioners next contend that the trial court's failure to award attorney fees and expenses pursuant to section 2-611 (Ill. Rev. Stat. 1985, ch. 110, par. 2-611) was error. During a lengthy hearing, petitioners reiterated for the trial court the seemingly endless course of inconsistent, contradictory, and misleading statements put forth by Macks in unofficial correspondence, as well as official court pleadings, including: Macks' letter of May 1979 to the attorney for decedent's estate claiming to have purchased all of decedent's right, title, and interest to the subject property many months prior to decedent's death and his answer to the original petition for citation denying that he was in possession of "any property belonging to the decedent," followed by successive responses to petitioners' request for production wherein Macks produced two completely different assignments of beneficial interest from the decedent for the same property, allegedly given in exchange for an unpaid $90,000 promissory note from Macks. Macks also gave testimony contradicting official court pleadings with respect to which properties were covered by the alleged note.
In response to the trial court's concern over Macks' failure to mention the existence of any note in his initial pleading, Macks responded, and continues to maintain, that this omission was based upon his sincere belief that the purported note constituted a "debt of liability" and not an "asset" as to him, and that the estate, or a possible third party as holder of the note, was at all times in possession of an enforceable property right. The trial court apparently accepted these arguments concluding that Macks "sincerely believed he was the owner of the subject property with good basis," and that this was neither "a case of lying," nor "an attempt to bring fraud upon the court."
*248 Prior to its amendment in 1976, section 41 of the Civil Practice Act (the predecessor of section 2-611 of the Code of Civil Procedure), provided for the assessment of fees and expenses against a party that made allegations or denials "without reasonable cause and not in good faith, and found to be untrue." (Ill. Rev. Stat. 1975, ch. 110, par. 41.) Effective September 1976, the requirement that the movant prove the allegations were "not in good faith" was eliminated and sanctions under section 2-611 are now proper where the moving party demonstrates that his opponent has abused his right of free access to the courts by pleading untrue statements of fact which he knew, or reasonably should have known, were untrue. (Dayan v. McDonald's Corp. (1984), 126 Ill. App.3d 11, 16, 466 N.E.2d 945; Third Establishment, Inc. v. 1931 North Park Apartments (1981), 93 Ill. App.3d 234, 417 N.E.2d 167.) In view of the totality of circumstances surrounding the alleged transactions, including the relative positions of the parties involved, we find that the trial court erred in failing to award attorney fees and expenses under this section.
 11 It is elementary that debts due and owing a decedent constitute personal assets of that decedent's estate. (See People v. Coslet (1977), 67 Ill.2d 127, 364 N.E.2d 67; In re Estate of Spaits (1983), 117 Ill. App.3d 142, 453 N.E.2d 39.) We are simply unable to accept Macks' contention that as an attorney, experienced real estate investor, and bank chairman of the board, he honestly believed that an admittedly unpaid promissory note in the amount of $90,000 constituted nothing more than a "liability" as to him while, at the same time, he had enjoyed exclusive use and control over the subject property from July 1977 up until the time he sold it in 1978 and retained all of the proceeds totaling more than four times that amount.
Alternatively, Macks seeks to excuse his omission in March 1980 based on the fact that at the time of his initial answer he was unaware whether the purported note had been negotiated to a third party. We find this argument to be baseless in light of the attorney's letter received by Macks in April 1979 which claimed one-half of the subject property to be an asset of the estate, for which it had received neither an accounting of income and expenses nor any profits.
We believe that the facts before us present precisely the type of conduct which the legislature sought to penalize by its enactment of section 2-611 (see Dayan v. McDonald's Corp. (1984), 126 Ill. App.3d 11; Ready v. Ready (1961), 33 Ill. App.2d 145, 178 N.E.2d 650), and we therefore reverse that portion of the trial court's order denying fees and expenses under this section and remand for a hearing as to the amounts due petitioners.
*249 Finally, petitioners contend that punitive damages are appropriate under the circumstances.
Petitioners claim that even if this court grants the additional relief requested in the form of prime-rate interest, attorney fees, and litigation expenses, they will only be placed in essentially the same financial position that they would have been in had Macks not breached his fiduciary duty, without taking into account the fact that they have been forced to spend several years fighting for their rightful inheritance due to Macks' fraud, misconduct, breach of fiduciary duty, and dilatory tactics. They further contend that this court's failure to award punitive damages under the circumstances will only serve to condone similar conduct by fiduciaries in the future.
 12 We are mindful of the fact that punitive damages are not favored and are to be awarded with caution and confined within narrow limits only where a wrongful act is accompanied by aggravating circumstances such as wilfulness, wantonness, malice, or oppression so as to warrant their imposition as punishment to the wrongdoer and deter the defendant and others from committing like conduct in the future. (Glass v. Burkett (1978), 64 Ill. App.3d 676, 682-83, 381 N.E.2d 821; Tolle v. Interstate Systems Truck Lines, Inc. (1976), 42 Ill. App.3d 771, 356 N.E.2d 625, appeal denied (1977), 65 Ill.2d 580.) We respectfully disagree with the trial court's finding, however, that such aggravating circumstances were not present in the instant case. Rather, we believe that the pattern of conduct exhibited by Macks from the inception of this controversy was motivated by more than mere ignorance or oversight on his part and that the imposition of punitive damages is not only warranted, but necessary in order to deter similar conduct in the future. See Glass v. Burkett (1978), 64 Ill. App.3d 676; In re Application of Busse (1984), 124 Ill. App.3d 433, 464 N.E.2d 651.
We therefore reverse those portions of the trial court's order denying punitive damages and attorney fees and expenses and affirm that portion granting post-judgment interest on $90,000 from June 4, 1982, until July 11, 1984. Further, this cause is remanded with directions to award prejudgment interest to petitioners at the prime rate in addition to statutory interest for vexatious delay, to be calculated from July 7, 1977, and for further proceedings consistent with the views expressed herein.
Affirmed in part, reversed in part and remanded.
QUINLAN, P.J., and BUCKLEY, J., concur.