**SEABOARD SEED
COMPANY, Plaintiff,**

v.

**BEMIS COMPANY, INC., Defendant.**

**No. 84 C 957.**

United States District Court,
N.D. Illinois, E.D.

March 31, 1986.

Paul Noland, Marc A. Primack, Rooks, Pitts and Poust, Chicago, Ill., for plaintiff.

William T. McGrath, David E. Kawala, Chadwell & Kaysel, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Seaboard Seed Company ("Seaboard") has filed an eight-count First Amended Complaint (the "Complaint") against Bemis Company, Inc. ("Bemis"), charging:

1. breach of fiduciary duty (Count I);

2. breach of contract (Count II);

3. interference with business relationships (Count III);

4. unfair competition (Count IV);

5.-7. federal, common-law and state trademark infringement (Counts V to VII); and

8. deceptive trade practices (Count VIII);

all arising out of Bemis' use of Seaboard's trademark ("Quick Green") on polyethylene bags used to package grass seed. Bemis has now moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment on Counts I, V, VI, VII and VIII. For the reasons stated in this memorandum opinion and order, that motion is granted as to Count VIII and denied in all other respects.

### Facts [1]

Seaboard wholesales grass seed and bird seed. After buying seed in bulk from seed accumulators, Seaboard mixes and packages the seed for its retail customers (Valentine Dep. 9, 33; Final Pretrial Order ["PTO"] ¶¶ 2, 4). Seaboard generally packages its consumer grass seed products in polyethylene bags (Valentine Dep. 10).

Since at least 1971 Seaboard has purchased seed packaging materials from Bemis, a manufacturer of polyethylene bags (PTO ¶¶ 3, 6). Bemis employed a flexographic printing process to print the polyethylene bags sold to Seaboard (PTO ¶ 7). That process requires three types of impressions (id.):

1. a zinc engraving of the package design;

2. a Bake-O-Lite mold made from the engraving; and

3. a rubber plate made from the Bake-O-Lite mold and used in the actual printing process.

Both zinc engravings and Bake-O-Lite molds can be used for more than one printing job (id. ¶ 9). Bemis does not make zinc engravings itself, obtaining them instead either from the customer or from an outside supplier (id. ¶ 8).

In November 1978 Seaboard contracted with Meijer, Inc. ("Meijer")—a large chain of discount stores—to provide grass seed for Meijer's controlled-label grass seed line (id. ¶ 12). On November 29 Seaboard sent a letter to Meijer stating in part (id. ¶¶ 13-14):

---

1. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose this Court must view the evidence in the light most favorable to the nonmovant—in this case Seaboard. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984).

1. Seaboard "authorizes Meijer to use our trademark name 'Quick Green.'"

2. "Meijer agrees to amortize over a four year period costs for color separations and plates on new packaging developed for Meijer by Seaboard."

In accordance with that contract Seaboard supplied packaged grass seed to Meijer from 1979 to 1982 (*id.* ¶ 15b). Seaboard ordered the packaging for the Meijer account from Bemis (*id.* ¶¶ 15a, 18). Some of the bags ordered by Seaboard for Meijer's private label grass seed bore the name "Meijer Quick Green Grass Seed Mixture" (*id.* ¶ 16). Seaboard owns a federally registered trademark in the word combination "Quick Green" (*id.* ¶ 17). None of the bags in which Seaboard packaged grass seed for Meijer ever designated "Quick Green" as a registered trademark by using the symbol "®" or "TM" (*id.* ¶ 19).

To print the bags ordered by Seaboard, Bemis obtained zinc engravings from a supplier and retained Seaboard's engravings to fill future orders (*id.* ¶ 18).[2] In that respect Bemis' advertising brochure to customers and prospective customers (P.Ex. D) states:

> *Engravings*—your engravings are stored at no charge and maintained in excellent condition by Bemis. All engravings owned by customers are available upon request.

When Seaboard stopped ordering packaging from Bemis in 1983, Bemis held about 50 sets of engravings for Seaboard (PTO ¶ 37).

In 1982 Meijer switched to Great Western Seed Co., Inc. ("Great Western")[3] for its grass seed supply (*id.* ¶ 21). Because Meijer intended to use the same type of bag designs it had used in the past, Meijer provided sample bags to Great Western (Bolster Dep. 25–27; Loft Dep. 9–10, 13). In December 1982 both Meijer and Great Western asked Seaboard to sell its inventory of packaging for Meijer's controlled label grass seed (PTO ¶ 23). Seaboard refused to sell those bags (*id.*). Great Western later ordered packaging for the Meijer account from Bemis (*id.* ¶¶ 24–25). That packaging included bags bearing the name "Meijer Quick Green Grass Seed Mixture" (*id.*). In February 1983 Bemis shipped over 46,000 bags with the "Quick Green" label to Great Western (*id.* ¶ 28).

There is a dispute as to whether Bemis used Seaboard's zinc engravings to produce those bags (P. Exs. I, J and O).[4] Bemis first ordered zinc engravings for Great Western in April 1983 (PTO ¶ 32).

### Bemis' Contentions

Bemis advances three contentions in support of its summary judgment motion:

1. No fiduciary relationship existed between Seaboard and Bemis.

2. The "fair-use" doctrine embodied in 15 U.S.C. § 1115(b)(4) ("Section 1115(b)(4)") bars Seaboard's federal, common-law and state trademark infringement claims.

3. Bemis' conduct inflicted no "public injury" and hence cannot violate the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act"), Ill. Rev.Stat. ch. 121½, ¶¶ 261 to 317.

Each requires separate consideration.

### Breach of Fiduciary Duty

Complaint ¶¶ 24 and 25 allege:

24. By virtue of the relationship between Seaboard and Bemis, including the agreement to allow Bemis to retain possession of the engravings created and developed by Seaboard, a fiduciary relationship arose between the parties.

25. The aforesaid conduct by Bemis including: (a) wilfully and maliciously

---

**2.** Bemis billed Seaboard for the cost of the engravings. That in turn led Seaboard to obtain Meijer's agreement to amortize those costs, as reflected in the November 29, 1978 letter already quoted in this opinion.

**3.** Great Western is a wholly owned subsidiary of Lofts Seed Co. ("Lofts"). Both parties use "Great Western" to refer to both Great Western and Lofts. This opinion will follow suit.

**4.** For current purposes that dispute must be resolved by assuming Bemis did so (see n. 1).

permitting a competitor to use Seaboard's engravings; and (b) wilfully and maliciously causing damage to or loss of Seaboard's engravings, constitutes a breach of Bemis of its fiduciary duty to Seaboard.

Bemis contends the supplier-customer relationship between itself and Seaboard remained a strictly commercial relationship and cannot create a fiduciary duty running to Seaboard.

*Carey Electric Contracting, Inc. v. First National Bank of Elgin,* 74 Ill. App.3d 233, 237–38, 30 Ill.Dec. 104, 108–09, 392 N.E.2d 759, 763–64 (2d Dist.1979) describes two kinds of origins of a fiduciary relationship, one as a matter of law and the other fact-bound:

> A confidential or fiduciary relationship involves confidence and trust on one side and dominance and influence on the other.... Such a relationship exists as a matter of law between attorney and client; guardian and ward; and principal and agent, and may exist in other cases where one party is heavily dependent upon the advice of another. The existence of such a fiduciary relationship must be shown by proof so clear and convincing, so strong, unequivocal and unmistaken that it leads to only one conclusion.

> \*    \*    \*    \*    \*    \*

> A confidential relationship only goes to a situation where one party, because of some close relationship, relies very heavily on the judgment of another.

Seaboard relies on both those sources of relationships to support its position.

Seaboard first contends a fiduciary relationship arose between the parties because Seaboard relied on Bemis' packaging expertise. Seaboard says:

1. Bemis advertised itself as "America's Packaging Leader" (P.Ex. D).

2. Bemis' 1982 net sales amounted to $681 million, while Seaboard's total 1982 revenue was only $8 million (P.Exs. E and F).

3. Seaboard and Bemis enjoyed a "longstanding" business relationship (Valentine Dep. 299; Valentine Aff.).

4. Seaboard used Bemis as its exclusive packaging supplier (Valentine Dep. 55).

5. Seaboard relied on Bemis' expertise in producing polyethylene bags (Hirsch Dep. 53–54; Valentine Dep. 299).

Seaboard would have it Bemis therefore occupied a dominant business position and Seaboard relied heavily on Bemis' packaging advice. From that premise Seaboard concludes Bemis had a fiduciary duty to safeguard Seaboard's business interests.

But *Carey Electric,* 74 Ill.App.3d at 238, 30 Ill.Dec. 108–09, 392 N.E.2d 763–64 makes clear most business relationships do not of themselves create fiduciary obligations:

> Plaintiffs allege they trusted Benchmark and that that trust, plus the dominant position occupied in their business relationships because it was the general contractor, operated to create a confidential relationship. We cannot agree. The parties herein were all businesses, theoretically operating at arms length, and their relationship was governed according to contracts made between them. Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.

> \*    \*    \*    \*    \*    \*

> We do not say that businesses linked by contract can never be found to be parties in a confidential relationship, but mere allegations that one businessman simply trusted another to fulfill his contractual obligations is certainly not enough. If we were to hold otherwise, most contracting parties might well be found to be in this type of confidential relationship.

That passage describes the situation here. Neither the parties' business relationship as such nor Seaboard's reliance on Bemis' advice in its field of expertise creates fiduciary obligations on Bemis' part. As

*Schuppenhauer v. Peoples Gas Light & Coke Co.*, 30 Ill.App.3d 607, 613, 332 N.E.2d 583, 589 (1st Dist.1975) put it (in a slightly different context):

> The fact that business transactions are conducted does not justify an inference of a fiduciary obligation. So, unless the alleged confidentiality is predicated upon a pre-existing relation of trust with the disclosee-defendant, it is incumbent upon a plaintiff to show not merely that he meant to place confidence in the defendant, nor even that he expressed that intent, but also that the defendant at least impliedly accepted that confidence and agreed to respect it.

■ But Seaboard points to more than its general business dealings with Bemis to support its contention. Seaboard emphasizes:

1. Bemis advertised its willingness to store its customers' engravings (P.Ex. D).

2. Bemis in fact held more than 50 sets of engravings for Seaboard.

Hence Seaboard says Bemis acted as its "agent" in handling the engravings and owed Seaboard the fiduciary duty recognized as a matter of law in the principal-agent relation. See *Black v. Gray*, 403 Ill. 503, 505, 87 N.E.2d 635, 636 (1949). Bemis retorts its posture was no more than that of bailee—a nonfiduciary position. See *Wright v. Autohaus Fortense, Inc.*, 129 Ill.App.3d 422, 425, 84 Ill.Dec. 633, 635, 472 N.E.2d 593, 595 (4th Dist.1984).

In all candor, that dispute over whether Bemis should be characterized as a general agent or as a mere bailee of Seaboard really misses the mark. Bemis' potential liability stems not from Bemis' claimed status as a general fiduciary of Seaboard but from Bemis' obligation with respect to Seaboard's specific property (the engravings). Neither side's submissions have explored Bemis' duty to Seaboard in that limited sense.

In much the same way, both parties have failed to focus on the consequences of attaching or not attaching a "fiduciary" label to Bemis' status. After all, the success or failure of Seaboard's cause of action depends not on its legal label but on the facts set forth to support it.[5] Whatever the proper characterization of Bemis' position may be, the facts surely do not negate any obligation to Seaboard as a matter of *law*. Bemis' Rule 56(b) motion on Count I fails.

### *"Fair Use"*

Bemis argues Section 1115(b)(4)'s "fair use" doctrine forecloses each of Seaboard's trademark infringement claims. Bemis contends:

1. Section 1115(b)(4) bars Seaboard's federal trademark infringement claim directly.

2. Because Section 1115(b)(4) merely codifies a common-law defense, Bemis' "fair use" also defeats Seaboard's common-law trademark infringement claim.

3. Section 1115(b)(4) preempts Seaboard's state law trademark infringement claim based on Ill.Rev.Stat. ch. 140, ¶¶ 24–28.

Those contentions fail at the very outset, for Bemis does not establish a fair use defense at all. Hence this opinion need not deal with Bemis' second and third arguments (each of which rests on that same defense).

■ Seaboard's "Quick Green" trademark is now incontestable under 15 U.S.C. § 1065 ("Section 1065") (PTO ¶ 17). Bemis says Section 1115(b)(4) nevertheless protects its use of the mark:

> If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be

---

5. This should not be taken as a criticism of Bemis alone for having filed a Rule 56 motion as to Count I. Seaboard put matters on the wrong track in the first place by setting out as a separate "claim for relief" (Rule 8(a)) what is nothing more than an alternative legal theory of liability. As common as that practice may be, it is conceptually unsound. 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1219 (1969 ed. and 1985 pocket part). Had not Seaboard done so, it would more likely have been plain to Bemis that Count I was not really a separate "claim" for purposes of a Rule 56(b) motion.

conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defenses or defects is established:

\* \* \* \* \* \*

(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark ... of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin.

To prevail under that provision, Bemis must show each of three things:

1. "Quick Green" is only "descriptive of ... the goods."

2. Bemis did not use the term "as a trade or service mark."

3. Bemis used the mark "in good faith."

As for the claimed "descriptive" nature of the "Quick Green" mark, Seaboard first retorts:

1. Because "Quick Green" is incontestable under Section 1065, it cannot be characterized as "descriptive."

2. Seaboard licensed Meijer to use the trademark "Quick Green." Because Meijer, as Bemis' licensee, cannot invoke the fair use doctrine, Bemis cannot premise its fair use defense on Meijer's actions.

Seaboard's first contention is without merit. Its second need not be resolved under the circumstances here.

■ As for the first argument, it wholly misperceives the nature of Section 1115(b)(4)'s fair-use defense. Of course an incontestable mark is conclusively presumed to be "nondescriptive" (except, of course, for a "common descriptive name"—often termed a "generic" mark, see Section 1065(4)'s proviso). *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1185 (5th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516,

67 L.Ed.2d 816 (1981). But the possibility that the claimed *infringer* may use the mark in a "descriptive" way makes the fair-use defense available if the other conditions of Section 1115(b)(4) are met. Seaboard thus cannot rely on its trademark's incontestability alone to defeat Bemis' fair use defense.

Seaboard's licensing argument poses a neat conundrum: whether a trademark licensee (whose use of the mark is viewed as a trademark use—a designation of the *owner* as the source—so long as the latter polices the quality of the trademarked goods sufficiently to negate the existence of an impermissible license in gross) can say *it* used the trademark merely in a descriptive manner. This opinion need not decide that legal question, for Bemis has failed to establish beyond factual dispute that Meijer used the mark "Quick Green" solely to describe its product. *M.B.H. Enterprises, Inc. v. WOKY, Inc.,* 633 F.2d 50, 54–55 (7th Cir.1980) identifies the appropriate inquiry:

Descriptive devices are those that "impart information directly" or are necessary to the description of the goods or services in question. *Union Carbide Corp. v. EverReady, Inc., supra,* 531 F.2d [366] at 379 [7th Cir.1976] (*quoting* A. Seidel, S. Dalroff & E. Gonda, *Trademark Law and Practice* § 4.06 at 77 (1963)). They are to be distinguished from fanciful or coined devices, which are utterly undescriptive, and from "suggestive" devices, which combine elements of descriptiveness and of fancy. "Suggestive" devices convey "an idea which requires some operation of the imagination to connect it with the" service. *Id.*

In that respect Bemis says the words were used only descriptively because:

1. *All* Meijer's other private labels carried descriptive names: Meijer Grass Seed Mixture for play areas and high traffic use, Meijer Shady Grass Seed Mixture, Meijer Good Grass Seed Mixture, Meijer Best Grass Seed Mixture,

and Meijer Kentucky Bluegrass Seed (PTO ¶ 16; P.Ex. A).

2. Meijer intended its grass seed names to identify each seed's characteristics, as reflected by Kurkiewicz Dep. 16:

Q. Why did you want a quick-type name?

A. It's something to tell the customer the intended use of that type of seed, and it's a grass seed that basically germinates in seven days. It's faster germinating than the rest of the seeds.

Q. Is that the type of blend you eventually named Quick Green?

A. Yes.

and by Hirsch Dep. 16:

The Meijer promotional item became Meijer Quick Green. Why? Because it germinated quickly. It had better quality turf in it than somebody else's promotional grass seed.

And we upgraded it. We used not only better seed, but we used some Kentucky Bluegrass in it, which added value for the consumer. They came up quickly.

Bemis' first position is a non-sequitur. Even if Meijer's other grass seed labels are descriptive in nature, that does not mandate the conclusion Meijer used "Quick Green" only in the same manner.

Bemis' second argument misses not only the distinction between "common descriptive" (or generic) terms—which cannot become trademarks—and "merely descriptive" terms—which can (see this Court's opinion in *A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F.Supp. 1081, 1090–91 & n. 5 (N.D.Ill.1985))—but also misses entirely the next step up the trademark ladder, the "suggestive" mark that "combine[s] elements of descriptiveness and fancy" (*M.B.H. Enterprises*, 633 F.2d at 54). Nothing in the evidence relied on by Bemis negates, as a matter of law, the character of "Quick Green" as *at least* "merely descriptive" or, even more, "suggestive." Indeed, given the fact that it is *not* the seed but rather the resulting grass that is "green," the mark is really not descriptive

as a matter of definition. Instead, it *suggests* what the grass seed will produce; it does not describe the seed itself.

Bemis R. Mem. 8 and 11 implies the rejection of its fair-use defense will grant Seaboard a monopoly on the use of the common words "quick" and "green" in grass seed descriptions. *Soweco*, 617 F.2d at 1185 identifies the source of that argument:

The "fair-use" defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods.

In light of the preceding discussion, Bemis' contention is just nonsense. Seaboard's competitors are free to describe any characteristic of their grass seed. They may call it "quick-growing"; they may call the resulting grass "green." They cannot of course describe the *seed* itself as green—it is not. Seaboard's trademark protects only the word combination "Quick Green." Because that mark carries a "suggestive" meaning, the rejection of Bemis' fair-use defense does not allow Seaboard to appropriate a "descriptive" term.

█ In sum, Bemis has failed to establish the absence of a genuine issue of material fact on its fair-use defense. Because Bemis has failed at the outset to show Seaboard's "Quick Green" trademark is merely descriptive as a matter of law, this opinion will not address the remaining two elements of the fair-use defense.

### *Seaboard's Fraud-Based Claim*

█ Complaint ¶ 37 charges Bemis committed "deceptive trade practices" in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act"), Ill.Rev.Stat. ch. 121½, ¶¶ 261 to 317. Act § 262 provides in part:

Unfair methods of competition and unfair or deceptive acts or practices ... in the conduct of any trade or commerce are hereby declared unlawful....

Bemis attacks Seaboard's Act-based claim in two ways: Bemis says its conduct:

1. did not affect "trade or commerce" as defined by Act § 261(f); and

2. inflicted no "public injury" and hence falls outside the scope of the Act.

Because the first argument is dispositive, the second will not be addressed.

Act § 261(f) defines "trade" and "commerce" in a geographically limited manner:

The terms "trade" and "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.[6]

Bemis points to several facts to show its conduct did not "directly or indirectly affect[ ] the people of this State":

1. Bemis' Film Division in Indiana was the locale of any asserted damage to Seaboard's engravings (PTO ¶ 3).

2. Bemis sold bags bearing the "Quick Green" mark to Great Western in Oregon (id. ¶ 24).

3. Great Western shipped grass seed in those bags to Meijer, which has stores in Michigan, Ohio and Kentucky—but not Illinois (id. ¶ 12).

In short, none of the conduct Seaboard complains of involved trade or commerce impacting in any way on Illinois consumers.[7]

Seaboard Mem. 13 retorts:

1. Bemis operates other plants in Illinois (P.Ex. D).

2. Bemis is "a national firm."

Those facts are in the "so what?" category, for at most they suggest that Bemis' gen-

eral business activities affect Illinois. But Act § 262 requires the "deceptive act or practices" to occur in "trade or commerce" —which under Act § 261(f) requires an effect on Illinois consumers.

Seaboard has failed on an essential ingredient of its required showing. Bemis is entitled to summary judgment on Seaboard's claim under the Act.

### Conclusion

There is no genuine issue of material fact, and Bemis is entitled to a judgment as a matter of law, as to Complaint Count VIII. That count is dismissed. As to all other counts, summary judgment is denied.

---

6. [Footnote by this Court] Statutory use of the word "include" can have any one of several connotations. For example, it can be employed in the sense of "shall include, but not be limited to," so that what follows is merely illustrative and not exhaustive. In this instance, however, it would distort the normal meaning of language if "include" were read to extend the statute's coverage to cover trade or commerce that

affects non-Illinoisans but *not* "the people of this State."

7. It must be remembered the Act's focus is to protect consumers, and the thrust of Act § 261(f) is toward *Illinois* consumers. But even if Illinois residents generally (rather than consumers alone) were viewed as the protected class, Seaboard would lose on this claim.