**BA MORTGAGE AND INTERNATIONAL REALTY CORPORATION,**
Plaintiff,

v.

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,**
as Trustee etc., et al., Defendants.

Ronald R. COCO, Sr. and William McLinden, Counterplaintiffs,

v.

**BA MORTGAGE AND INTERNATIONAL REALTY CORPORATION,**
Counterdefendant.

No. 88 C 5005.

United States District Court,
N.D. Illinois, E.D.

Jan. 31, 1989.

Michael Weininger, Lawrence M. Karlin, Barry A. Erlich, Katz, Randall & Weinberg, Chicago, Ill., for plaintiff.

Harvey J. Barnett, Ira J. Bodenstein, Michael S. Blazer, Martin D. Tasch, Harvey J. Barnett & Associates, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

BA Mortgage and International Realty Corporation ("BAMIRCO") has sued American National Bank and Trust Company of Chicago ("Bank"), Southwick Properties, Inc. and Ronald R. Coco, Sr. ("Coco") and William McLinden ("McLinden") (collectively "Coco–McLinden"), seeking:

 1. to foreclose its mortgage on the Southwick Office Centre in Schaumburg, Illinois (Count I); [1]

2. to enforce the Coco–McLinden written guaranty (the "Guaranty") of a portion of the mortgage note ("Note") (Count II); and

3. to foreclose its security interest in personal property executed by Coco–McLinden (Count III).

Defendants' answer asserts, by way of affirmative defenses to all three of BAMIRCO's claims, that BAMIRCO:

1. breached its duty of good faith and fair dealing;

2. was a joint venturer and breached its fiduciary duty owed to defendants in that capacity;

3. is not entitled to foreclose the mortgage because it is a joint venturer;

4. is estopped from foreclosing; and

5. has waived its right to foreclose or declare a default.

Coco–McLinden also state alternative added defenses to the Count II claim on their Guaranty:

1. BAMIRCO's Complaint is premature and does not present a justiciable controversy.

2. They are entitled to a reformation of the Guaranty.

Finally, Coco–McLinden have filed a four-count Counterclaim along the same lines as the affirmative defenses:

1. Count I advances a claim for breach of joint venture and breach of fiduciary relationship.

2. Count II states a claim for breach of the obligation of good faith and fair dealing.

3. Count III claims waiver and estoppel.

4. Count IV seeks a declaratory judgment reforming the Guaranty on the basis of mutual mistake.

BAMIRCO has now filed a motion under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss all four counts of Coco–McLinden's Counterclaim and a Rule 12(f) motion to strike:

1. the affirmative defenses claiming breach of a joint venture and fiduciary relationship;

---

**1.** Count I also invokes a number of other fore- closure-related remedies.

2. all affirmative defenses to the suit on the Coco–McLinden Guaranty; and

3. Counterclaim ¶¶ 4, 6, 7, 18 and 53 through 56 as assertedly redundant, immaterial and impertinent.

For the reasons stated in this memorandum opinion and order:

1. Both aspects of Counterclaim Count I—that asserting breach of a joint venture and that claiming a breach of fiduciary duty—are dismissed.

2. Counterclaim Count II, claiming breach of the implied duty of good faith, remains viable.

3. Counterclaim Count III, based on waiver and estoppel, is dismissed on Coco–McLinden's own motion.

4. BAMIRCO's motion to dismiss the Counterclaim Count IV alternative claims for a declaratory judgment or for reformation is granted.

5. Defendants' affirmative defenses based on the claimed breach of a joint venture and breach of fiduciary duty are stricken.

6. BAMIRCO's motion to dismiss all affirmative defenses to its Complaint Count II claim is granted in principal part (but not entirely).

7. Its motion to dismiss Counterclaim ¶¶ 4, 6–7 and 18 is granted, while its motion to dismiss Counterclaim ¶¶ 53–56 is denied.

### Facts [2]

In February 1985 Coco–McLinden were general partners holding an option on land in Schaumburg, Illinois. They were in the business of constructing and developing commercial real estate and planned to improve the property with an office building (the "Project") (¶¶ 1, 3).

Coco–McLinden approached BAMIRCO to see if it was interested in financing the Project. They had obtained a loan from BAMIRCO in the past and were familiar with its personnel (¶ 2). In this instance they met with BAMIRCO President Larry Knobel ("Knobel") (¶ 4).

Knobel told Coco–McLinden that BAMIRCO had developed a new financing program under which its construction loan, after it had become funded as a permanent loan, would "convert into an ownership situation" between BAMIRCO and Coco–McLinden (*id.*). At that time BAMIRCO was to become a "50/50 participant" with Coco–McLinden (*id.*).[3] BAMIRCO explained that both during and beyond the life of the construction loan it would retain substantial control over the Project, including the rights (¶ 23):

1. to approve the sale price of the Project in the event of sale;

2. to approve all leases;

3. to approve all changes in plans or specifications;

4. to approve the management leasing agreement and the management leasing agent;

5. to approve all major subcontractors and the architect; and

6. to approve the expenditure of all funds.[4]

BAMIRCO was to receive if the Project were sold or refinanced was characterized as "additional interest" and would increase from a low of 25% of the profit if the event took place during the first six months of the loan to an interim figure of 35%, then to 50% if the event occurred during the last year of the loan term (see also ¶ 22).

---

**2.** Familiar Rule 12(b)(6) principles require this Court to accept as true all of Coco–McLinden's well-pleaded factual allegations, drawing all reasonable inferences in their favor (*Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). Rule 12(f) operates on the identical principle (see, e.g., *Kelly v. Kosuga,* 358 U.S. 516, 516, 79 S.Ct. 429, 430, 3 L.Ed.2d 475 (1959); 5 Wright and Miller, *Federal Practice and Procedure: Civil* § 1380, at 787 & n. 97 (1969 and 1987 supp.) and cases cited there). All this opinion's references to the Counterclaim will simply take the form "¶ —."

**3.** That Counterclaim allegation is not an accurate portrayal of the parties' deal. As the loan application and mortgage commitment (Complaint Ex. G) reflects, the profit participation

**4.** This Court's examination of the documents attached to the pleadings, though it has made no effort to be exhaustive at this threshold stage of the litigation, has produced some doubt as to the accuracy of these allegations (most particularly that relating to expenditures of all funds once the Project had left the construction stage and was in operation, a matter not included among the Negative Covenants of the Construc-

On February 13, 1985 BAMIRCO issued its commitments for the $14.3 million construction loan and standby first mortgage loan (¶ 5). As is typical of such construction projects, BAMIRCO told Coco–McLinden they would have to guarantee repayment of the entire construction loan. However, the parties agreed that if the standby loan were funded Coco–McLinden would guarantee only "the top 20% of the loan" (¶ 6). Coco–McLinden say all parties understood they did not have the assets to cover their guaranty (¶ 7).

Coco–McLinden assert it was the intent of the parties "as evidenced by the loan documents" that the project would be built, leased and then either sold or refinanced within five years (the term of the loan). It was intended to build the office center and lease it as expeditiously as possible to permit prompt sale or refinancing, not to hold the building on a long term basis (¶ 8).

On February 25 the package of documents called for by the loan commitments was executed:

1. Bank—as trustee under the land trust created by Coco–McLinden for that purpose—executed the $14.3 million Note.

2. Bank, Coco–McLinden and BAMIRCO executed a Construction Loan Agreement.

3. As security for the Note and Construction Loan Agreement, Bank executed a Mortgage and Security Agreement (the "Mortgage") and Coco–McLinden executed the Guaranty, a personal guaranty of the Note and Mortgage (¶¶ 12–14).

In addition to those principal documents, the parties signed and delivered other security documents that need not be detailed because not relevant to the discussion in this opinion.

Under the Construction Loan Agreement BAMIRCO agreed to fund all interest and all operating and leasing expenses, including tenant improvements and leasing commissions, for the life of the loan (¶ 19). Amounts estimated as necessary to meet those expenses were allocated to various reserve accounts (¶ 20). Those reserves provided a mechanism for funding the operation and leasing of the Project (¶ 21).

During the first 15 to 18 months of the loan it became apparent that to attract tenants in the Schaumburg market, it would be necessary to grant rent concessions exceeding those estimated by the parties. That meant a two-year delay in rent on each new lease, with a correspondingly accelerated depletion of the reserve amounts built into the loan (¶ 24). Because of those market conditions, BAMIRCO approved leases submitted by Coco–McLinden even though they did not fit within the intended parameters and put the loan "out of balance" by depleting the reserves (¶ 25).

In May 1986 Coco–McLinden began negotiating a lease with Merrill Lynch for a large portion of the remaining office space. Though significant lease concessions would clearly be required, BAMIRCO told Coco–McLinden "we have to make deals." For months Coco–McLinden were encouraged to make the Merrill Lynch deal (¶¶ 26–28).

By December 1986 Coco–McLinden had negotiated a lease with Merrill Lynch under which the building would have been about 40% occupied (¶¶ 29, 32). Even though the agreed-upon lease concessions would exhaust the funds available under the loan (including the reserve accounts), the building would have been self-sustaining for at least a year (¶¶ 30–31).

Despite BAMIRCO's having been informed about the status of those negotiations, Knobel refused to approve the Merrill Lynch lease. He told Coco–McLinden the FDIC was monitoring BAMIRCO's parent Bank of America and he could not "submit" the deal unless Coco–McLinden were themselves willing to invest $1.5 million—a demand he knew they could not meet (¶ 35). Knobel also told Coco–McLin-

---

tion Loan Agreement [its Section 7] or—on quick review—the Mortgage and Security Agreement). And of course allegations that do not track the exhibits made a part of the pleadings are not "well pleaded" and thus need not be accepted as gospel. For current purposes, though, Coco–McLinden's Counterclaim will be taken at face value.

den the proposed Merrill Lynch lease was not a "good market deal" (¶ 36).

Coco–McLinden believe that BAMIRCO, at about the same time as the Merrill Lynch turndown, was approving a major lease in the nearby Fifield Building (another office building complex it was financing about a mile from the Project, ¶ 11) that put the loan there substantially out of balance (¶ 37). Once word of the Merrill Lynch rejection spread to the real estate brokerage community that BAMIRCO had killed the deal, there was a widespread belief that no leasing to large institutional tenants requiring major lease concessions (essential to be given in the prevailing market) would be approved by BAMIRCO (¶ 38).

After the Merrill Lynch lease rejection, BAMIRCO forced Coco–McLinden to extend the construction loan for an additional six-month term on each of two separate occasions (¶ 40). Those extensions did not provide Coco–McLinden with any benefit (¶ 41), but they entitled BAMIRCO to greater fees and interest payments from Coco–McLinden, further depleting the reserves (¶ 42).

In spite of BAMIRCO's indications that it was going to foreclose, Coco–McLinden were able to procure three prospective major tenants: NEC, Incorporated ("NEC"), International Office Services, Incorporated and Responsive Marketing, Incorporated (¶¶ 44–45). Coco–McLinden again kept BAMIRCO fully advised of the progress of the negotiations. BAMIRCO encouraged Coco–McLinden to continue negotiating though the loan was in default (¶ 46).

During January through March 1988 (a time that Knobel was largely out of the country) Coco–McLinden negotiated with all three parties. BAMIRCO officers told Coco–McLinden "to get the [NEC] lease signed." When Knobel returned from Europe that lease was therefore ready for signature, but he "absolutely refused to approve" it (¶¶ 49–50).

BAMIRCO then filed this mortgage foreclosure action. Shortly thereafter NEC signed a lease in the Fifield Building (¶ 52).

■ Finally, after this Court had appointed a receiver, Ambassador Insurance Company expressed interest in leasing space in the Project (¶¶ 53–54). However, Knobel also refused to approve that lease (¶ 56).

*Motion To Dismiss* [5]

BAMIRCO has moved to dismiss all four counts of Coco–McLinden's Counterclaim. Coco–McLinden Mem.Dis. 2 [6] offers a voluntary dismissal of the Count III counterclaim asserting waiver and estoppel—those are really defenses and not independent causes of action. Counterclaim Count III is therefore dismissed, and this opinion turns to the other claims.

■ Initially BAMIRCO Mem.Dis. 3–4 argues Coco–McLinden lack standing to assert the Count I and II claims. More precisely (because the concepts of "standing" and "real party in interest" do not necessarily coalesce for all purposes), it urges Bank is the "real party in interest" required by Rule 17(a) to maintain a claim for damages here. In that respect *American National Bank and Trust Co. of Chicago v. Weyerhaeuser Co.,* 692 F.2d 455, 459 (7th Cir.1982) has held courts "must look to the applicable state substantive law."

Coco–McLinden are the beneficiaries of what was originally a phenomenon unique to Illinois law: the land trust. Ill.Rev.Stat. ch. 110, ¶ 15–1205 has codified, for pur-

**5.** As an initial matter, this diversity action of course calls for the application of Illinois choice-of-law rules (*Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Those rules plainly dictate reference to Illinois substantive law in this entirely Illinois-oriented transaction. And even were that not the case, where as here the parties raise no choice of law issue and treat one state's law as controlling, that is properly viewed as a stipulation as to the applicable law (*National*

*Ass'n of Sporting Goods Wholesalers, Inc. v. F.T. L. Marketing Corp.,* 779 F.2d 1281, 1284–85 (7th Cir.1985)).

**6.** Separate memoranda have been filed on the motion to dismiss and the motion to strike. References to those memoranda will therefore take the form "[Name of party] Mem.Dis. [page]" or "[Name of party] Mem.Strk. [page]."

poses of the new Illinois Mortgage Fore-
closure Law, the case law development of
that concept:

> "Land trust" means any trust arrange-
> ment under which the legal and equitable
> title to real estate is held by a trustee,
> the interest of the beneficiary of the
> trust is personal property and the benefi-
> ciary or any person designated in writing
> by the beneficiary has (i) the exclusive
> power to direct or control the trustee in
> dealing with the title to the trust proper-
> ty, (ii) the exclusive control of the
> management, operation, renting and sell-
> ing of the trust property and (iii) the
> exclusive right to the earnings, avails
> and proceeds of the trust property.

And *Wachta v. First Federal Savings and
Loan Association of Waukegan*, 103 Ill.
App.3d 174, 176, 58 Ill.Dec. 676, 679, 430
N.E.2d 708, 711 (2d Dist.1981) (citations
omitted) typifies the judicial treatment of
the vehicle:

> The owner of the beneficial interest in a
> land trust is accorded four basic powers:
> (1) to possess, manage and physically
> control the real estate; (2) to receive all
> income generated by the property; (3) to
> direct the trustee in dealing with title to
> the real estate; and (4) to receive the
> proceeds of any sale of the property
> made pursuant to the power of direction.

That in turn leads to the means of deter-
mining the proper party litigant in a land
trust situation (*Just Pants v. Bank of Rav-
enswood*, 136 Ill.App.3d 543, 547, 91 Ill.
Dec. 49, 53, 483 N.E.2d 331, 335 (1st Dist.
1985) (citations omitted)):

> In an action involving a land trust, the
> question of whether the beneficiary or
> the trustee is the proper party depends
> on the nature of the action in light of the
> rights and duties established by the trust
> agreement.... The beneficiary in a land
> trust is the proper party to litigation
> involving his rights and liabilities of
> management, control, use and possession
> of the property.

In those terms this is an easy case.
Count I alleges a claim for "breach of joint
venture and breach of fiduciary relation-
ship." Of course the purported joint ven-
ture is between Coco–McLinden (and not
Bank) and BAMIRCO—it is no accident
that the beneficiaries and not the trustee
have filed the counterclaim. And as for
the asserted breach of fiduciary obli-
gations, ¶ 59 alleges that in breaching
those obligations BAMIRCO "interfered
with and controlled [Coco–McLinden's] abil-
ity to lease the property." Similarly ¶¶ 62–
63 allege BAMIRCO "seeks to disgorge
[Coco–McLinden] from their 50% interest,"
so they "have been unable to realize the
value of the property and have lost, and
will continue to lose, their equity in the
same."

All those allegations directly involve the
"rights and liabilities of management, con-
trol, use and possession of the property"
(*Just Pants*, 136 Ill.App.3d at 547, 91 Ill.
Dec. at 53, 483 N.E.2d at 335). As such
they affect the beneficiaries' interests, not
those of the trustee. Coco–McLinden are
the proper parties to maintain the Count I
claims based on breach of a fiduciary duty.[7]

■ Coco–McLinden are likewise the
proper parties to assert the Count II claim
for breach of the covenant of good faith
and fair dealing. There they allege BA-
MIRCO arbitrarily refused to approve the
leases to sabotage the project and thus
obtain the property for itself (¶ 66). Again
that claim affects Coco–McLinden's "con-
trol, use and possession of the property."

In sum, Counts I and II advance the
rights of the beneficiaries, not of the trust-
ee. Coco–McLinden are proper parties to
assert those claims under Rule 17(a).

### 1. *Count I*

Like partnerships, joint ventures are jur-
al relationships to which the law attaches a
number of legal consequences.[8] *Ambuul*

---

7. Though no added authority needs to be ad-
   duced to support that self-evident conclusion, it
   comports with the approach in other Illinois
   cases (see, e.g., *Long v. Elk Grove Village*, 64
   Ill.App.3d 1006, 1008, 21 Ill.Dec. 785, 787, 382

N.E.2d 79, 81 (1st Dist.1978) (beneficiary the
proper party in mandamus proceeding to com-
pel issuance of construction permit)).

8. This statement is somewhat oversimplified.
   In fact, as a reading of the Uniform Partnership

*v. Swanson,* 162 Ill.App.3d 1065, 1070, 114 Ill.Dec. 272, 276, 516 N.E.2d 427, 431 (1st Dist.1987) (citations omitted) states those consequences in summary terms:

> A joint venture is an association of two or more persons to carry out a single enterprise for profit.... The relationship between joint venturers, like that existing between partners, is fiduciary in character and imposes upon the participants an obligation of loyalty and good faith in their dealings with each other with respect to the enterprise.... The relationship is governed by the legal principles applicable to partnerships.

As for the attributes that determine the existence of the jural relationship, *Ambuul, id.* at 1068, 114 Ill.Dec. at 274, 516 N.E.2d at 429 sets them out in these terms:

> (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge by each joint venturer; (4) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) provision for the joint sharing of profits and losses.

As might be expected (*id.,* citations omitted):

> The existence of a joint venture may be inferred from facts and circumstances showing such an enterprise was in fact entered into ... and the intent of the parties is the most significant element.

Finally (*id.* at 1070, 114 Ill.Dec. at 276, 516 N.E.2d at 431):

> Whether or not a joint venture exists is a question for the trier of fact as he is in the best position to judge the credibility of the witness.[9]

In this instance it is unnecessary to go beyond "the most significant element": the intent of the parties. Here the mortgage specifically provides (Complaint Ex. B ¶ 32):

> *Mortgagor not a Joint Venturer or Partner*: Mortgagor and Mortgagee acknowledge and agree that in no event shall Mortgagee be deemed to be a partner or joint venturer with Mortgagor or any beneficiary of Mortgagor. Without limitation of the foregoing, Mortgagee shall not be deemed to be such a partner or joint venturer on account of its becoming a mortgagee in possession or exercising any rights pursuant to this Mortgage or pursuant to any other instrument or document evidencing or securing any of the indebtedness secured hereby, or otherwise.

That provision is essentially mirrored in the construction loan agreement (Complaint Ex. D ¶ 10.15):

> *Loan Agreement.* This Agreement is a loan agreement entered into to provide for the orderly disbursement of the proceeds of the loan and to define the rights, obligations and liabilities of the parties hereto. This Agreement, and any document or agreement entered into in connection herewith, shall not be deemed to create any relationship between Borrower and Lender other than a debtor-creditor relationship. Borrower hereby acknowledges that Lender is not a partner or joint venturer of the Trust, the Beneficiary agrees to hold Lender harmless and indemnify Lender from any and all damages resulting from any such construction of the relationship of the parties hereto.

And those provisions implement the identical agreement built into the construction loan commitment and the standby commitment that generated the parties' document-

---

Act makes plain, even those legal consequences are really gap-fillers—rules that operate in the absence of the parties' manifested intention to apply different rules.

**9.** [Footnote by this Court] BAMIRCO Mem.Dis. 5 erroneously says "what constitutes a joint venture is a question of law." That mischaracterization is hard to understand, given the clear statement in *Ambuul* and BAMIRCO's citation to that case immediately before the statement quoted in this footnote. But as the text discussion shows, neither credibility nor the weighing of evidence is involved here in light of the parties' flat-out rejection of a joint venture relationship in their unambiguous contracts.

ed transaction (Counterclaim Ex. A ¶ 9; Counterclaim Ex. B ¶ 15):

> Nothing contained herein or in any other documents evidencing or securing the loan shall be construed to mean that BAMIRCO is a partner or joint venturer of Borrower. Borrower will indemnify and hold harmless BAMIRCO from any and all damages and costs resulting from construction of the relationship between Borrower and BAMIRCO as a partnership or joint venture.

To be sure, *Ambuul*, 162 Ill.App.3d at 1069, 114 Ill.Dec. at 275, 516 N.E.2d at 430 (citation omitted) says:

> It is, however, the nature of the enterprise undertaken that controls and not the form of the agreement in determining whether a joint venture exists.

But that language and the familiar concept it embodies are simply the legal equivalent of the adage traditionally attributed to Lincoln:

> If you call a tail a leg, how many legs has a dog? Five? No, calling a tail a leg don't *make* it a leg.

Thus a document may be labeled (say) "Lease" or "Employment Agreement" and yet possess all the characteristics of a joint venture—and if it does, the corollary legal consequences of a joint venture relationship will follow.

But in this instance that possibility is taken out of play entirely by the need for Coco–McLinden to allege (among other things) the key characteristic of intent. That is a subject on which they negotiated and agreed with BAMIRCO in unequivocal terms—*no* joint venture was intended. There is no hint of fraud in the inducement, no hint of coercion or other deprivation of free will. Under those circumstances this Court is certainly entitled to take the freely-negotiating parties at their word. To do otherwise would do violence to the free-

market principles that underlie the law of contracts.

■ Accordingly the joint-venture component of Counterclaim Count I is dismissed.[10] It remains to consider the same count's assertion of the existence of a fiduciary relationship outside of the joint venture claim. In that regard Coco–McLinden Mem.Dis. 15 says:

> Where facts are presented which establish that the bank customer was subject to domination and influence on the part of the bank, a fiduciary duty will be found to exist.

Coco–McLinden are correct that Illinois courts will find a fiduciary relationship as a matter of fact (not law) (*In re Estate of Wernick*, 151 Ill.App.3d 234, 244, 104 Ill. Dec. 486, 493, 502 N.E.2d 1146, 1153 (1st Dist.1986), *leave to appeal granted*, 114 Ill.2d 546, 108 Ill.Dec. 426, 508 N.E.2d 737 (1987)):

> when one party reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first. . . .

But as this Court pointed out in *Seaboard Seed Co. v. Bemis Co.*, 632 F.Supp. 1133, 1136–37 (N.D.Ill.1986), quoting *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill.App.3d 233, 30 Ill. Dec. 104, 392 N.E.2d 759 (2d Dist.1979), Illinois courts have held most business relationships do not of themselves create fiduciary obligations.[11] Indeed, *Carey Electric, id.* at 238, 30 Ill.Dec. at 108, 392 N.E.2d at 763 specifically said:

> Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.

Essentially Illinois presumes such business transactions do *not* give rise to a fiduciary relationship. And Coco–McLinden have alleged no facts that would over-

---

10. This of course implies no ruling as to whether or not *some* legal consequences that flow from the existence of a joint venture relationship may apply to the BAMIRCO–Coco–McLinden relationship by reason of some of the contractual terms of their deal. That possibility is dramatically different from the wholesale im-

portation of legal rules and standards that would follow from ascribing joint venture status to their transaction.

11. Accord, *Gutfreund v. Christoph*, 658 F.Supp. 1378, 1395 (N.D.Ill.1987).

come that presumption and convert BA-MIRCO into their fiduciary. Their allegations that BAMIRCO controlled the Project by rejecting the leases do not perform that transformation.

Both grounds advanced in Counterclaim Count I have proved wanting. That count is dismissed in its entirety.

### 2. *Count II*

■ In Illinois "a covenant of fair dealing and good faith is implied into every contract absent express disavowal" (*Foster Enterprises, Inc. v. Germania Federal Savings and Loan Association*, 97 Ill. App.3d 22, 28, 52 Ill.Dec. 303, 308, 421 N.E.2d 1375, 1380 (3d Dist.1981)). *Foster Enterprises, id.* at 30, 52 Ill.Dec. at 309, 421 N.E.2d at 1381 (citations omitted) goes on to explain the effect of that implication:

> Good faith between contracting parties requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously.... Where contractual discretion is exercised in bad faith, the contract is breached....

*Dayan v. McDonald's Corp.*, 125 Ill. App.3d 972, 990–91, 81 N.E.2d 156, 170, 466 N.E.2d 958, 972 (1st Dist.1984) (citations omitted) summarizes the law in this area:

> [T]he doctrine of good faith performance imposes a limitation on the exercise of discretion vested in one of the parties to a contract.... In describing the nature of that limitation the courts of this state have held that a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

BAMIRCO Mem.Dis. 9–10 says Illinois does not recognize an independent cause of action for breach of the implied covenant, citing *Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286 (N.D.Ill.1983) for that proposition. There this Court's colleague, Honorable William Hart, said just that in the context of an at-will employment contract because (*id.* at 1290):

If the implied obligation to deal in good faith created such a cause of action, it would eviscerate the at will doctrine altogether.

But that does not vitiate Coco–McLinden's claim here, for as Judge Hart also noted in *Gordon, id.* at 1289:

> [T]he principle of performance in good faith comes into play in defining and modifying duties which grow out of specific terms and obligations. It is a derivative principle.

On that score ¶ 65 says:

> Specifically, BAMIRCO owed [Coco–McLinden] an obligation to act in good faith in exercising approval of leases, expenditures of funds, extensions of time and reasonable notice of its actions....

And ¶ 66 alleges BAMIRCO:

> had a conflict of interest and failed to disclose ... material and critical facts ... in order to sabotage the Project so that it could obtain the same for itself knowing that it is a valuable property and that it is capable of being leased and therefore sold or refinanced.

Coco–McLinden thus identify specific provisions of the financing agreements that reposed discretion in BAMIRCO. For instance, Construction Loan Agreement ¶ 7.7 vests exclusive approval of all leases with BAMIRCO. That same agreement's ¶ 10.16 provides:

> Whenever provision is made herein for the approval or consent of Lender [BAMIRCO], or that any matter be to Lender's satisfaction, unless specifically stated to the contrary, such approval or consent shall be made by Lender in its sole discretion and determination.

That kind of unfettered discretion is precisely what the implied covenant of good faith was designed to deal with. And Coco–McLinden do plead facts that raise an inference of bad faith: Thus ¶ 11 alleges BAMIRCO was financing the Fifield Building less than one mile from the Project, and ¶ 52 alleges NEC became a tenant of the Fifield Building after Knobel had rejected its tenancy in the Project. That type of

conflict of interest (alleged in ¶ 66) reasonably raises an inference of bad faith.

More generally Coco–McLinden allege BAMIRCO encouraged them to enter into leases but then consistently refused to approve them. Though the inference is certainly more attenuated from that scenario alone, it might arguably be linked with a breach of the good faith obligation.

In summary, Counterclaim Count II adequately states a claim. BAMIRCO's motion to dismiss it is denied.[12]

### 3. *Count IV*

■ In a somewhat confusing claim, Coco–McLinden contend no present and actual controversy exists as to the claimed $2,860,000 guaranty because "the property has not been sold and hence there is no deficiency" (¶¶ 71–72). As suggested in the "Facts" section of this opinion, their Guaranty (Complaint Ex. F) began as one covering the entire $14.3 million loan but, on completion of the Improvements, became limited to $2,860,000.

But Coco–McLinden say they do not owe even that. Rather, they assert this:

1. According to ¶ 71:

The commitment (Exhibit A) was incorporated by reference in the Note.[13]

2. Under that commitment the Coco–McLinden guaranty was limited to the "top 20%" of the loan.

3. According to ¶ 72, the phrase "top 20%" means "the amount remaining unpaid on the Note after a sale of the property at its fair market value."

To Coco–McLinden those allegations signal the existence of two conflicting documents:

1. Their Guaranty literally requires them to guarantee $2,860,000.

2. By incorporating the "top 20%" concept, the Note requires BAMIRCO to sell the property and determine whether a deficiency exists.

But it takes only a little thought to see that contention of inconsistency rests on a flawed premise as to the need for a prior foreclosure sale.

As for the unconditional Guaranty itself, it embraces "the due and punctual payment of the principal ... [and] interest." That means any default in payment triggers the Coco–McLinden obligation, and in classic guaranty language they specifically waived all preconditions to that obligation: "diligence, presentment, protest, notice of dishonor, [or] demand for payment." And most importantly for present purposes, Guaranty ¶ 4 provides expressly:

that this Guaranty may be enforced by the Mortgagee without first resorting to or exhausting any other security or collateral, or without first having recourse to the Note or any other property covered by the Mortgage through foreclosure proceedings or otherwise....

In short, everything in the Guaranty teaches BAMIRCO has *no* obligation to sell the property before it enforces the Coco–McLinden obligation.

Nothing in the loan commitment's definition of that obligation even questions, let alone negates, that conclusion. It simply prescribes the maximum *amount* of that obligation ("top 20% ($2,860,000) of the

---

**12.** BAMIRCO R. Mem.Dis. 15–17 argues:

Undisputed facts appearing in the counterclaim and exhibits preclude a finding that BAMIRCO acted in bad faith.

But unlike the previously-discussed situation as to the intent to enter into a joint venture (squarely negated by the parties' negotiated agreements), this Court cannot fairly disregard what Coco–McLinden have said in their Counterclaim as to BAMIRCO's lack of good faith. As n. 2 indicates, all their well-pleaded factual allegations must be accepted as true on this Rule 12(b)(6) motion, and Coco–McLinden are entitled to reasonable inferences in that regard.

It is certainly reasonable to infer bad faith from the facts they have alleged.

**13.** [Footnote by this Court] That reference to "Exhibit A" is confusing, for that Counterclaim exhibit is the construction loan commitment, which is not referred to anywhere in the Note (which is Complaint Ex. A). But Note ¶ 20 does incorporate the *standby* loan commitment (Counterclaim Ex. B), and its Paragraph 13 says Coco–McLinden "will unconditionally guaranty (both joint and several) the top 20% ($2,860,000) of the loan." Hence Coco–McLinden's misstated claim survives—for the moment—on a different basis.

loan"[14]), not when and how the obligation may be enforced.

What that means is that the amount of the *loan,* and not the value of the *property,* at the time of enforcement fixes the Coco–McLinden obligation. Had the loan been fully funded, and had there then been a default before any principal had been paid, Coco–McLinden would have been on the hook for the full $2,860,000.[15]

No predicate exists, then, for the Coco–McLinden claim of documentary inconsistency as they have framed it. Neither their claim for declaratory relief nor their claim for reformation on mutual-mistake grounds has any validity in the terms they have stated those claims.

■ That would ordinarily dictate the final dismissal of Counterclaim Count IV. But the just-completed analysis has disclosed a flaw the lawyers for both sides have missed but this Court must view as establishing a viable claim for reformation under the controlling principle of *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). According to Complaint ¶ 7(J), the unpaid principal amount for which BAMIRCO sues on the Note is $13,113,322.53—apparently not because the entire $14.3 million had been disbursed and then over $1 million in partial repayments had reduced that figure, but because only the $13 million-plus amount had ever been disbursed in the first place (BAMIRCO Mem.Dis. 2).

Because neither litigant has focused on the problem at all, by definition neither has addressed the quantification of the guarantors' actual obligation for principal payment under those circumstances:

1. Is it $1,673,322.53, the amount by which the Note balance exceeds $11.44 million (80% of the $14.3 million commitment)? That figure would jibe with what the Coco–McLinden liability would have been if an original $14.3 million loan had been reduced to $13,113,322.53 by partial payments on account.

2. Is it $2,622,664.51, the amount of the "top 20%" of the loan as actually disbursed?

3. Or is it some other figure?

Whatever the answer, it clearly cannot be $2,860,000.[16] Yet the Guaranty speaks only of the latter figure—the amount for which BAMIRCO has sued Coco–McLinden. At least in surface terms that has the ring of a mutual mistake in the framing of the Guaranty, and hence a basis for reformation.

This Court must dismiss Counterclaim Count IV as it has been framed. Such dismissal, however, is without prejudice to the possible reassertion of a reformation claim on the basis just discussed.

*Motion To Strike*

Rule 12(f) says:

[T]he court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

This opinion will address the various aspects of BAMIRCO's motion under those standards—coupled of course with the judicial gloss they have acquired. *Lirtzman v. Spiegel, Inc.,* 493 F.Supp. 1029, 1031 (N.D. Ill.1980) (citations omitted) outlines the operative general principles in that respect:

Motions to strike defenses are not favored, and are not ordinarily granted unless the language in the pleading at issue both has no possible relation to the controversy and is clearly prejudicial.... Before a motion to strike can be granted, the court must instead "be convinced

---

**14.** For the moment this opinion will ignore the inconsistency between "top 20% of the loan" and a flat $2,860,000 guaranty (the latter is how the Guaranty document reads). That disparity has no bearing on the *time* when the Guaranty may be enforced, so it will be considered a bit later.

**15.** As is always the case with mortgage loans, the Note and Mortgage provide for acceleration of the entire principal balance in the event of an uncured default in payment or performance.

**16.** No opinion is expressed here as to a topic on which the parties have been totally silent: the existence and extent of Coco–McLinden's liability for other components of the Note and Mortgage obligations—interest, expenses, attorneys' fees and so on.

that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed."

### 1. Breach of Joint Venture and Breach of Fiduciary Duty

■ BAMIRCO Mem.Strk. 2 seeks to strike the affirmative defenses based on breach of a joint venture and breach of a fiduciary relationship because they fail the first prong of the Rule 12(f) test—insufficiency as a matter of law. No real discussion of that subject is needed. Because this opinion has already found such insufficiency on the corresponding motion to dismiss Counterclaim Count I, the defenses are stricken as well.

### 2. Affirmative Defenses to BAMIRCO's Count II Guaranty Claim

■ Complaint Count II is based on the already-discussed Coco–McLinden Guaranty. BAMIRCO urges Coco–McLinden have waived all defenses to that claim because Guaranty ¶¶ 7(d) and 7(k) specifically waive:

> (d) Any defenses whatsoever that the Debtor [Bank] may or might have to the payment of the indebtedness guaranteed hereby or to the performance or observance of any of the covenants or conditions contained in the Note, Mortgage or other loan documents.

> (k) Any defense (other than the payment of the indebtedness hereby guaranteed and the full performance of the terms and conditions of the Mortgage in accordance with the terms hereof) that the Guarantors [Coco–McLinden] may or might have to its respective undertakings; liabilities and obligations hereunder, each and every such defense being hereby waived by the undersigned Guarantors.

BAMIRCO is substantially correct. *Du-Quoin State Bank v. Daulby*, 115 Ill. App.3d 183, 185, 70 Ill.Dec. 874, 875–76, 450 N.E.2d 347, 348–49 (5th Dist.1983) (citations omitted) teaches:

> The rules of construction applicable to contracts generally also apply to con-tracts of guaranty ..., and if such a contract is unambiguous, it must be enforced as written.

That principle applies with full vigor to waivers in a guaranty: When they are clear and unambiguous, Illinois courts consistently enforce them (see, e.g., *Morris v. Columbia National Bank of Chicago*, 79 B.R. 777, 782 (N.D.Ill.1987) and the numerous cases cited there).

That is the case here—the quoted provisions plainly provide Coco–McLinden are waiving all defenses except prior payment and satisfaction of the debt. Coco–McLinden Mem.Strk. 4–5 says not that the waiver is not applicable, but rather that BAMIR-CO's argument:

> puts the cart before the horse and pre-supposes liability on the Note and guarantee. This argument ignores the principle that a guarantor's liability is derivative. A guarantor can be liable only if his principle [sic] becomes liable.... Simply stated, if the obligation to pay has not arisen, there is nothing for which Coco and McLinden can be held liable.

That contention as stated is of course dead wrong—it flies directly in the face of Guaranty ¶ 4. But even had it been correct, it does not address the waiver point at all. Coco–McLinden entered into an unequivocal undertaking to pay a portion of the principal and interest on the Note. Their contract also expressly waived their right to assert all defenses. They must live by that agreement.

■ But one aspect merits additional discussion, though not focused on by either side. One of the Coco–McLinden affirmative defenses asserts BAMIRCO's breach of the covenant of good faith implied in every contract. *Morris*, 79 B.R. at 785 held that obligation survived—even in the face of an express waiver of defenses that the Illinois courts would honor—because "good faith conduct is not waivable." This Court concurs in that conclusion, at least until provided with Illinois authority to the contrary.

It must be recognized that the implied covenant of good faith reflects a strong

public policy judgment: Parties with unfettered contractual discretion cannot be allowed to exercise that discretion in bad faith. And the essence of a sufficiently strong public policy is that it overrides contractual provisions—or more accurately, that the public policy will cause courts to deny enforcement of contractual terms to the opposite effect. Absent a showing to the contrary, this Court will place the implied covenant in question into that category.

In summary, all affirmative defenses to BAMIRCO's Complaint Count II are stricken except that based on the implied covenant of good faith. That one survives unless and until persuasive authority to the contrary is provided to this Court.

### 3. "Immaterial and Impertinent" Allegations

 BAMIRCO Mem.Strk. 4 seeks to strike Counterclaim ¶¶ 4, 6–7 and 18, arguing they directly contravene the "unambiguous terms of the loan documents" and hence violate the parol evidence rule. All those paragraphs deal either with conversations preceding execution of the loan documents or with what Coco–McLinden characterize as the "understanding" of the parties. In light of this opinion's rulings on the Counterclaim and affirmative defenses, those paragraphs (which do not play a part in Coco–McLinden's surviving contentions) are stricken.

 Finally, BAMIRCO seeks to strike Counterclaim ¶¶ 53–56, which deal with BAMIRCO's rejection of the Ambassador Insurance lease after the appointment of a receiver. BAMIRCO Mem.Strk. 5 says Coco–McLinden lack standing to assert a violation arising out of that rejection.

But those paragraphs are relevant to Coco–McLinden's surviving bad faith claim, and this opinion has already rejected BAMIRCO's standing argument. That portion of its motion is denied.

### Conclusion

Both aspects of Counterclaim Count I—asserting breach of a joint venture and breach of fiduciary duty—fail to state a claim and are dismissed. Counterclaim Count II—claiming breach of the implied covenant of good faith—is viable, and BAMIRCO's motion to dismiss that claim is denied.

Counterclaim Count III is dismissed on Coco–McLinden's own motion. Finally, Counterclaim Count IV—alternatively seeking a declaratory judgment or reformation—is dismissed, though the dismissal is without prejudice should Coco–McLinden decide to reassert an altered claim.

Coco–McLinden's affirmative defenses based on breach of joint venture and breach of fiduciary duty are stricken. Affirmative defenses to BAMIRCO's Complaint Count II have been waived, and all are stricken except that based on the implied covenant of good faith.

Counterclaim ¶¶ 4, 6–7 and 18 are stricken. But because Counterclaim ¶¶ 53–56 are relevant to Coco–McLinden's surviving claim for breach of the duty of good faith, BAMIRCO's motion to strike those paragraphs is denied.